

FILED by _LBC_ D.C.

ELECTRONIC

**August 11, 2009**

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### WEST PALM BEACH DIVISION

CASE NO. 09-_____-CIV-_____/_____

| | |
|---|---|
| **FASTSIGNS INTERNATIONAL, INC.,** ) | **09-CV-81155-ZLOCH/ROSENBAUM** |
| ) | |
| **Petitioner,** ) | |
| ) | |
| **and** ) | Case No. |
| ) | |
| **JOSEPH JOHN CIFRODELLA, LJC** ) | |
| **MARKETING, INC. and LYNN RENEE** ) | |
| **GABAY,** ) | |
| ) | |
| **Respondents.** ) | |
| _____/ | |

## PETITION TO CONFIRM ARBITRATION AWARD

Petitioner, FASTSIGNS International, Inc. requests confirmation of an arbitration award

against Respondents, Joseph John Cifrodella ("Cifrodella"), LJC Marketing, Inc. ("LJC") and

Lynn Renee Gabay ("Gabay"), and alleges:

1.      This is an action to confirm an arbitration award brought pursuant to 9 U.S.C. § 9.

2.      Jurisdiction in this Court is founded on diversity of citizenship, 28 U.S.C. § 1332,

the parties being citizens of different states and the amount in controversy in excess of $75,000,

exclusive of interest and costs.

3.      Petitioner is a citizen of the State of Texas, being a corporation organized and

existing under the laws of the State of Texas with its principal place of business in Carrollton,

Texas.

4.      Respondents Cifrodella and Gabay are citizens and residents of the State of

Florida, residing at 2764 South Evergreen Circle, Boynton Beach, Florida in this judicial district.

Respondent LJC is a citizen of the State of Florida, being a corporation organized and existing under the laws of the State of Florida with its principal place of business in Boynton Beach, Florida, in this judicial district.

5.      Petitioner and Respondents are parties to a written franchise agreement involving interstate commerce and calling for the resolution of disputes by arbitration. A copy of the parties' franchise agreement is attached as Exhibit A.

6.      In accordance with the parties' agreement to arbitrate, and upon occurrence of certain disputes between them, Petitioner initiated an arbitration proceeding against Respondents before the American Arbitration Association ("AAA"). A copy of the Petitioner's Demand for Arbitration is attached as Exhibit B.

7.      Nancy A. Thomas was duly appointed as arbitrator to hear the parties' dispute, and the parties were duly notified that a hearing would be conducted at the offices of the American Arbitration Association in Dallas, Texas on July 23, 2009. A copy of the Notice of Hearing is attached as Exhibit C.

8.      Arbitrator Thomas heard the parties' dispute, received the evidence offered by Petitioner, and rendered her Award on July 31, 2009. A copy of the Award is attached as Exhibit D.

9.      The Award ordered Respondents to pay Petitioner $73,636.90, comprising damages in the amount of $71,386.90 and the administrative fees of the American Arbitration Association and Arbitrator's compensation in the amount of $2,250, and post-award interest. The Award also granted injunctive relief enforcing a post-termination covenant not to compete in the parties' franchise agreement and preventing Respondents from infringing Petitioner's

2

trademark. In addition, Petitioner is entitled to recover its attorneys' fees incurred in this confirmation proceeding.

10.     The Award further provided, in pertinent part, that the period of the injunctive relief shall continue for two years from the date of termination of the franchise agreement or until February 17, 2011.

11.     Respondents have not complied with the injunction since entry of the Award, and no part of the money damages portion of the Award has been paid.

12.     This petition for confirmation is brought within one year of the rendering of the Award, and no application to vacate, modify, or contest the Award has been made.

WHEREFORE, Petitioner FASTSIGNS International, Inc. requests:

a)     Confirmation of the Arbitration Award;

b)     Entry of a permanent injunction, enjoining Respondents Joseph John Cifrodella, LJC Marketing, Inc. and Lynn Renee Gabay, and all persons in active concert or participation with them, for a period of two years ending February 17, 2011 from owning, maintaining, operating, engaging in, or having any direct or indirect interest in any business which is the same as or similar to their former FASTSIGNS Center in Boynton Beach, Florida including any business that produces and/or offers for sale graphics, banners, signs, ready-to-apply lettering, exhibits and displays, or digital imaging, which business is located within the territory defined in Respondents' FASTSIGNS' franchise agreement dated September 19, 2003, or within a ten (10) mile radius of any FASTSIGNS Center that is owned or operated by FASTSIGNS International, Inc., any affiliate of FASTSIGNS International, Inc. or any franchisee of FASTSIGNS International, Inc.;

3

c)     Entry of a permanent injunction enjoining Respondents Joseph John Cifrodella, LJC Marketing, Inc., and Lynn Renee Gabay, and all persons in active concert or participation with them, from using the name "Flash Signs" (or any variant thereof which is confusingly similar to "FASTSIGNS") to conduct a business that produces and/or offers for sale graphics, banners, signs, ready-to-apply lettering, exhibits and displays or digital imaging;

d)     Entry of a permanent injunction, enjoining Respondents Joseph John Cifrodella, LJC Marketing, Inc., and Lynn Renee Gabay from representing or implying to any member of the public, directly or indirectly, that they are FASTSIGNS franchisees or are in any way affiliated with FASTSIGNS International, Inc.;

e)     Entry of a mandatory injunction requiring Respondents Joseph John Cifrodella, LJC Marketing, Inc., and Lynn Renee Gabay to:  (i) assign the telephone number 561/737-4779, and any associated directory listings, to FASTSIGNS International, Inc.; (ii) cancel all telephone numbers listed under the name "Flash Signs" including, but no limited to, 561/791-7449, and any email address or internet domain name having "Flash Signs" (or any variant thereof) as a component part; (iii) destroy Cyrious customer database and all customer graphics files; and (iv) return to counsel for FASTSIGNS International, Inc. FASTSIGNS' new owner training manual excerpts (Exhibit 6 in the arbitration), FASTSIGNS' operations manual excerpts (Exhibit 7 in the arbitration), CD containing FASTSIGNS' training and operations manuals (Exhibit 28 in the arbitration), and CD containing currently versions of FASTSIGNS' manuals (Exhibit 29 in the arbitration);

f)     Entry of a money judgment in favor of petitioner, FASTSIGNS International, Inc. and against Respondents Joseph John Cifrodella, LJC Marketing, Inc. and Lynn Renee Gabay in the amount of $73,636.90, plus interest of 5% per annum from July 31, 2009;

4

g)    An award of its reasonable attorneys' fees and costs incurred in this proceeding;

and

h)    Such other and further relief as this Court deems appropriate.

Respectfully submitted,

Christian C. Burden
Christian.Burden@dlapiper.com
Florida Bar No.: 0065129
DLA PIPER LLP (US)
100 N. Tampa Street, Suite 2200
Tampa, FL  33602-5809
Phone:  (813) 229-1447
FAX:  (813) 229-2111
Attorneys for Petitioner

5

# EXHIBIT A

CHGO1\30993356.1



FASTSIGNS International Inc. • 2550 Midway Road, Ste. 150 • Carrollton, TX 75006 • 214-346-5600 • FAX: 972-248-8201 • www.fastsigns.com

**FASTSIGNS INTERNATIONAL, INC.**

**FRANCHISE AGREEMENT**

**Joseph John Cifrodella**
**Lynn Renee Gabay**

**State of Florida**

**Claimant's Exhibit 3**

sign &
graphic
solutions
made
simple

FAREV3.03

### FASTSIGNS INTERNATIONAL, INC.
### FRANCHISE AGREEMENT

### TABLE OF CONTENTS

| SECTION | | Page |
|---|---|---|
| 1. | Franchise Grant | 1 |
| 2. | Term and Renewal | 2 |
| 3. | Fees | 3 |
| 4. | Advertising | 5 |
| 5. | Franchisee Organization | 7 |
| 6. | Site Selection; Lease; Plans and Construction | 9 |
| 7. | Duties of Franchisor | 10 |
| 8. | Training | 12 |
| 9. | Center Operations | 13 |
| 10. | Insurance | 15 |
| 11. | Taxes, Permits and Indebtedness | 17 |
| 12. | Records and Reports | 17 |
| 13. | Proprietary Marks | 18 |
| 14. | Confidential Manuals | 20 |
| 15. | Confidential Information | 21 |
| 16. | Default and Termination | 22 |
| 17. | Obligations Upon Termination or Expiration | 24 |
| 18. | Transfer of Interest | 26 |
| 19. | Covenants | 30 |
| 20. | Independent Contractor and Indemnification | 32 |
| 21. | Entire Agreement and Modification | 34 |
| 22. | Approvals | 34 |
| 23. | Non-Waiver and Remedies | 34 |
| 24. | Dispute Resolution | 35 |

| 25. | Notices | 36 |
| 26. | Limitations of Claims | 36 |
| 27. | Severability and Construction | 37 |
| 28. | Force Majeure | 37 |
| 29. | Compliance with Anti-Terrorism Laws | 38 |
| 30. | Acknowledgments | 38 |

Attachment "A" - Approved Location and Territory
Attachment "B" - Statement of Ownership Interests
Attachment "C" - Lease Addendum
Attachment "D" - Confidentiality and Ancillary Non-Compete Agreement
Attachment "E" - Telephone Irrevocable Power of Attorney
Attachment "F" - Internet Irrevocable Power of Attorney
Attachment "G" - Tax Irrevocable Power of Attorney
Attachment "H" – Franchise Agreement Renewal Amendment
Attachment "I" – Franchise Agreement Transfer of Interest Amendment
Attachment "J" – Franchise Agreement Conversion Franchise Amendment
Attachment "K" – Electronic Funds Transfer

## FASTSIGNS INTERNATIONAL, INC.
## FRANCHISE AGREEMENT

THIS FRANCHISE AGREEMENT (the "Agreement") is made and entered into this _10th_ day of _September_, 2002 by and between FASTSIGNS INTERNATIONAL, INC., a Texas corporation ("Franchisor"), and Joseph John Cifrodella and Lynn Renee Gabay (individually and collectively referred to as "Franchisee").

## WITNESSETH:

WHEREAS, Franchisor, as the result of the expenditures of time, skill, effort and money, has developed a comprehensive system for the promotion, development and operation of businesses which specialize in the production and marketing of signs, graphics, banners, ready-to-apply lettering, exhibits and displays, digital imaging and other complementary products and services, and which emphasize convenience and fast service ("System"). Said System provides competitive and economic advantages to Franchisor and its Franchisees;

WHEREAS, the distinguishing characteristics of the System include, without limitation, distinctive exterior and interior design, decor, color scheme and furnishings; uniform standards, technology, know-how and procedures for production of signs, graphics, digital imaging and banners; quality and consistency of products and services; inventory, management and financial control methods; training and assistance; and advertising and promotional programs, all of which may be changed, improved and further developed by Franchisor from time to time;

WHEREAS, Franchisor identifies the System by means of certain trade names, trademarks, service marks, logos, emblems, symbols and indicia of origin including, without limitation, the mark "FASTSIGNS", "FASTSIGNS", The One Day Sign & Lettering Experts", "FASTSIGNS, For A Quality Sign That's Right. On Time" and "Quality Signs. Done Right. On Time.", "Sign & Graphic Solutions Made Simple", and such other trade names, trademarks and service marks as Franchisor may develop in the future for the purpose of identifying for the public the source of services and products marketed under such marks and the System and representing the System's high standards of quality, appearance and service (collectively, "Proprietary Marks");

WHEREAS, Franchisee desires to use the System in connection with the operation of a FASTSIGNS Center, at the location specified herein, upon the terms and subject to the conditions hereinafter set forth;

NOW THEREFORE, in consideration of the premises and of the mutual undertakings, obligations and commitments contained herein, it is agreed between the parties as follows:

1. **Franchise Grant**

A.      Franchisor hereby grants to Franchisee the right, and Franchisee hereby undertakes the obligation, upon the terms and subject to the conditions hereinafter set forth, to develop and operate a FASTSIGNS Center (the "Center") and to use solely in connection therewith the Proprietary Marks and the System, as such may be changed, improved and further developed from time to time, only at the approved location described in Attachment "A" hereto.

B.      Franchisee shall not relocate the Center without the express prior written consent of Franchisor. This Agreement does not grant to Franchisee the right to franchise or operate the Center or to offer or sell any products or services described hereunder at or from any other location. At the time Franchisee requests Franchisor's consent to relocate, Franchisee shall not be in default under any provision of this Agreement, any amendments hereto or any other agreement between Franchisee and Franchisor or any of its subsidiaries or affiliates; and Franchisee shall have substantially and timely complied with all terms and conditions of such agreements during the term thereof.

with the provisions of Section 6, Franchisee shall be assigned a specific geographic area (the "Territory") by Franchisor. A description of Franchisee's Territory shall be set forth on Attachment "A-1". During the term of this Agreement, so long as Franchisee is in full compliance with the terms and conditions of this Agreement, Franchisor shall not establish or grant others the right to establish a Center in the Territory (subject to Subsection D. below). Franchisee shall use its best efforts to advertise and promote the Center in its Territory in accordance with Section 4 below.

D.    If at any time during the term of this Agreement, Franchisor desires to establish or authorize any other person to establish one or more FASTSIGNS centers in the Territory as a result of an increase in the Business Count in the Territory, Franchisor must be able to allocate a minimum count of four thousand (4,000) businesses to each Center in the revised territories. In the event there is any adjustment to the Attachment "A-1" to this Agreement, you will retain a minimum of four thousand (4,000) businesses in the Territory. Franchisor will not exercise its right to establish or authorize any other person to establish an additional Center for a minimum of five (5) years from the date of this Agreement. If Franchisee is then in full compliance with the terms and conditions of this Agreement and meets the then-current criteria established by Franchisor to develop an additional Center, then Franchisee shall have the option to obtain the right to develop and operate the additional center(s) by entering into a development agreement or franchise agreement, as the case may be. Franchisor shall provide Franchisee with notice thereof and the then-current form of franchise agreement or development agreement; provided, that the initial franchise fee shall be the same as the initial franchise fee described in Section 3 below. Franchisee shall have a period of thirty (30) days following notice from Franchisor to execute and return to Franchisor the applicable agreement and pay the initial fees thereunder. If Franchisee fails to timely exercise its rights under this Section 1.D, Franchisor may thereafter establish such center itself or authorize others to do so.

E.    Franchisee acknowledges and agrees that Franchisor and its affiliates have the right to establish, operate, franchise or license others to operate businesses at any location, including within the Territory by: (i) selling products and services other than those sold at the Center under the Proprietary Marks; or (ii) selling products and services similar to those sold at the Center under different trade names, trademarks or service marks in the Territory through similar outlets or alternative channels of distribution.

2.    <u>Term and Renewal</u>

A.    Except as otherwise provided herein, the term of this Agreement shall expire twenty (20) years from the date of execution.

B.    Franchisee may, at its option, renew this Agreement for an additional term of ten (10) years, subject to the following conditions, which must, in Franchisor's sole discretion, be met prior to renewal:

(1)    Franchisee shall give Franchisor written notice of Franchisee's election to renew not less than eight (8) nor more than twelve (12) months prior to the expiration of the initial term;

(2)    Franchisee shall renovate and modernize the facilities and equipment used in the Center to Franchisor's then-current standards for FASTSIGNS centers under the System;

(3)    Franchisee shall not be in default under any provision of this Agreement, any amendments hereto or any other agreement between Franchisee and Franchisor or any of its subsidiaries or affiliates; and Franchisee shall have substantially and timely complied with all terms and conditions of such agreements during the term thereof;

(4)    Franchisee shall have satisfied all monetary obligations owed by Franchisee to Franchisor and its subsidiaries and affiliates and shall have timely met those obligations throughout the term of this Agreement;

FAREV3.03                                           -2-

(5)     Franchisee shall execute Franchisor's then-current form of franchise agreement for the renewal term prescribed herein, which agreement shall supersede this Agreement in all respects and the terms of which may differ from the terms of this Agreement and may include, without limitation, a higher service fee and advertising fee; provided that Franchisee shall pay in lieu of an initial franchise fee a renewal fee equal to no more than four percent (4%) of the initial franchise fee then being charged to new franchisees under the System. Any franchise agreement signed for the renewal term shall contain substantially the terms and provisions set forth in Attachment H to this Agreement, except as Franchisor may otherwise consent to in writing;

(6)     Franchisee shall comply with Franchisor's then-current qualification and training requirements;

(7)     Franchisee shall present evidence satisfactory to Franchisor that Franchisee has the right to remain in possession of the approved location for the duration of the renewal term of this Agreement; and

(8)     Franchisee and each Controlling Principal (as defined in Section 27.E) shall execute a general release, in a form prescribed by Franchisor, of any and all claims against Franchisor, its subsidiaries, affiliates, successors and assigns and their respective officers, directors, shareholders, partners, agents, employees, and representatives, in their corporate and individual capacities, including, without limitation, claims arising under this Agreement or under federal, state or local laws, regulations, rules or orders.

3.     **Fees**

A.     Initial Franchise Fee.     Upon execution of this Agreement, Franchisee shall pay to Franchisor a franchise fee of Twenty Thousand Dollars ($20,000.00) which shall be deemed fully earned and nonrefundable upon execution of this Agreement (subject to the provisions of Section 16.B(2)) in consideration of the administrative and other expenses incurred by Franchisor in granting the franchise hereunder and for Franchisor's lost or deferred opportunity to franchise at the specified location to any other party.

B.     Service Fee.     During the term of this Agreement, Franchisee shall pay to Franchisor a continuous nonrefundable fee (the "Service Fee") equal to six percent (6%) of the monthly Gross Sales (as defined below) of the Center. The obligation to pay the Service Fee commences immediately upon opening of the Center for business. Payment of the Service Fee will be through electronic transfer and shall be done on the fifteenth (15th) day of the month following the month to which the Service Fee applies (unless such day is a holiday, in which case payment (electronic transfer) shall be done the next succeeding business day). Franchisor reserves the right to change the method of payment of the Service Fee from electronic transfer to such other manner of payment as Franchisor deems appropriate at any time. A business day for purposes of this Section 3.B means any day other than Saturday, Sunday, or the following national holidays: New Year's Day, Martin Luther King Day, Presidents' Day, Memorial Day, Independence Day, Labor Day, Columbus Day, Veterans' Day, Thanksgiving, and Christmas.

C.     Gross Sales.     As used in this Agreement, "Gross Sales" shall include all revenues from the sale of any and all services and products by Franchisee (whether for cash, credit or in exchange for other goods and services and regardless of collection in the case of credit) at or from the Center and all other revenues of every kind and nature related to the operation of the Center; provided, however, Gross Sales shall not include any sales taxes or other taxes collected from customers by Franchisee for transmittal to the appropriate taxing authority.

D.   <u>NAC Fee.</u>   During the term of this Agreement, Franchisor and Franchisee agree as follows:

(1)   Franchisee shall be required to deposit Seven Thousand Five Hundred Dollars ($7,500) into an account during new owner training to be administered by the National Advertising Council, Inc. ("NAC") (See Attachment I to this Agreement regarding a Center that has been acquired by Franchisee from an existing Franchisee). The Seven Thousand Five Hundred Dollars ($7,500) will be allocated for a marketing plan that will be developed during new owner training by the NAC for Franchisee, that will consist of direct mail programs (including a grand opening mail campaign), a lead generation software program, telemarketing campaigns, and marketing materials to be used by Franchisee as handouts and mailings during the first twelve (12) months the Center is open for business. Franchisor recommends that Franchisee allocate additional funds for advertising during the first twelve (12) months the Center is open for business, however, Franchisee is not required to do so. In addition, if the Center is opening without a Yellow Pages display ad for three (3) months or more, an additional deposit will be required based on the monthly amount that would be spent on a Yellow Pages display ad.

(2)   During the term of this Agreement, Franchisee shall pay to the NAC a continuous nonrefundable advertising fee (the "NAC Fee") equal to two percent (2%) of the monthly Gross Sales of the Center. The obligation to pay the NAC Fee shall commence immediately upon the opening of the Center for business. Payment of the NAC Fee shall be through electronic transfer and shall be done on the fifteenth (15th) day of the month following the month to which the NAC Fee applies (unless such day is a holiday, in which case payment (electronic transfer) shall be done the next succeeding business day). Franchisor reserves the right to change the method of payment of the NAC Fee from electronic transfer to such other manner of payment as Franchisor deems appropriate at any time. The term "business day" in this Section 3.D. shall have the same meaning as set forth in Section 3.B. above. All NAC Fees collected by Franchisor on behalf of the NAC shall be deposited in a separate account (the "NAC Fund") administered by Franchisor and the NAC.

E.   <u>Past Due Amounts.</u>   Franchisee shall not be entitled to withhold payments due Franchisor under this Agreement on grounds of alleged nonperformance by Franchisor hereunder. Any payment or report not actually received by Franchisor on or before such date shall be deemed overdue. Time is of the essence with respect to all payments to be made by Franchisee to Franchisor. Any payment not actually received by Franchisor on the due date and any payment for invoices made by a check that is returned by the bank upon which it is drawn for insufficient funds or for any other reason shall be deemed overdue. If any payment is overdue, Franchisee shall pay Franchisor, in addition to the overdue amount, interest on such amount from the date it was due until paid at the rate of eighteen percent (18%) per annum, or the maximum rate of interest permitted by law, whichever is less. Entitlement to such interest shall be in addition to any other remedies Franchisor may have at law or in equity, arising under this Agreement or otherwise.

F.   <u>Electronic Funds Transfer.</u>   Upon execution of this Agreement and/or at any time thereafter at Franchisor's request, Franchisee shall execute Attachment K to this Agreement and all other documents necessary to permit Franchisor to withdraw funds from Franchisee's designated bank account by electronic funds transfer ("EFT") in the amount of the service fee described in Section 3.B. above and the NAC fee described in Section 3.D.(2) above, and all other fees or amounts described in this Agreement, at the time or times that such fees or amounts become due and payable under the terms of this Agreement, provided such day is a business day (and if not a business day, on the next succeeding business day). Any fee calculated by reference to Gross Sales shall be based on the information in the applicable Gross Sales Report or, if the Gross Sales Report has not been received within the time period required by this Agreement, then Franchisor may process an EFT for the subject month based on one and half (1 ½) times the most recent Gross Sales Report provided to Franchisor by Franchisee; provided that if a Report for the subject month is subsequently received and reflects (i) that the actual amount of the fee due was more than the amount of the EFT by Franchisor, then Franchisor shall be entitled to withdraw additional funds through EFT from Franchisee's designated bank account for the difference; or (ii) that the actual amount of the fee due was less than the amount of the EFT by Franchisor, then Franchisor shall credit the excess amount to the payment of Franchisee's future obligations. Should any EFT not be

FAREV3.03                                    -4-

honored by Franchisee's bank for any reason, Franchisee agrees that it shall responsible for that payment plus a service charge applied by Franchisor and the bank, if any. If any payments are not received when due, interest may be charged by Franchisee in accordance with Section 3.E. above. Upon written notice to Franchisee, Franchisor may designate another method of payment, at Franchisor's sole discretion.

**4.      Advertising**

During the term of this Agreement, in order to promote the goodwill and public image of the system, Franchisor and Franchisee agree as follows:

A.      Franchisee, by virtue of its being a franchisee of Franchisor, shall be a member of the NAC. The board of directors of the NAC is comprised of Franchisor and franchisees elected by the members pursuant to the bylaws of the NAC. Monies from the NAC Fund are to be used to pay for advertising and promotional programs for the benefit of the System. Franchisee agrees that the NAC Fund shall be maintained and administered by Franchisor and the NAC or their designee as follows:

(1)      Subject to Section 4.F. below, the board of directors of the NAC shall direct all advertising programs and shall approve or disapprove the creative concepts, materials, and media used in such programs and the production thereof. All decisions of the NAC are subject to the approval of Franchisor. Franchisee agrees and acknowledges that the NAC Fund is intended to maximize general public recognition and acceptance of the Proprietary Marks and the System. In administering the NAC Fund, neither Franchisor nor the NAC undertake any obligation to make expenditures for Franchisee which are equivalent or proportionate to its contribution or to ensure that any particular franchisee benefits directly or pro rata from the production of such advertising;

(2)      Franchisee agrees that the NAC Fund may be used to satisfy any and all costs of maintaining, administering, directing and preparing advertising consistent with the objectives of the NAC, as set forth in its bylaws (including, without limitation, the cost of preparing television, radio, magazine, business journals and newspaper advertising campaigns; e-mail and web advertising, direct mail and outdoor billboard advertising; public relations activities; employing advertising agencies to assist therein; and providing promotional brochures and other advertising materials to the businesses operating under the System). Franchisor and the NAC reserve the right to use the NAC Fund in connection with the placement and allocation of such advertising. In addition, disbursements may be made to compensate Franchisor's employees who devote time and render services in the formulation, development and production of programs to satisfy such objectives and purposes, or who perform services in connection with the administration of the NAC Fund. The NAC Fund and its earnings shall not otherwise inure to the benefit of Franchisor or the NAC; and

(3)      An unaudited statement of contributions to and disbursements of the NAC Fund shall be prepared by Franchisor and made available to Franchisee annually upon request.

B.      In addition to the NAC Fund described in Section 3.D.(2), Franchisor shall have the right, in its sole discretion, to designate any geographic area in which two (2) or more FASTSIGNS centers are located as a region for establishing an advertising cooperative ("Advertising Cooperative"). At any time after a second FASTSIGNS Center located within a designated geographic area has opened for business, Franchisor can designate and Franchisee shall be required to form an Advertising Cooperative to operate within that geographic area. Each Advertising Cooperative shall be organized and governed in a form and manner, and must commence operations on a date determined by Franchisor in its sole discretion. Each Advertising Cooperative shall be administered and maintained in accordance with the terms of its governing documents. The Advertising Cooperative, all contributions thereto and any earnings thereon shall be used exclusively to meet any and all costs of developing, creating, producing, maintaining, administering, directing and preparing advertising and promotional materials and programs, subject to Franchisor's approval pursuant to Section 4.F., for Centers participating in the Advertising Cooperative. If at the time of the execution of this Agreement, an Advertising Cooperative has been established for a geographic area that includes Franchisee's Territory, Franchisee shall become a member of the

Advertising Cooperative upon execution and agree to pay the designated advertising contribution. If an Advertising Cooperative is established at any time during the term of this Agreement, Franchisee shall become a member of the Advertising Cooperative immediately after the Advertising Cooperative commences operation. In either case, Franchisee shall participate as follows:

        (1)     Franchisee shall contribute to the Advertising Cooperative such amounts as are required by the Advertising Cooperative; provided, however, Franchisee will not be required to contribute more than two percent (2%) of Franchisee's Gross Sales during any calendar month to the Advertising Cooperative unless, subject to Franchisor's approval, the members of the Advertising Cooperative have previously agreed in writing to contribute a specific amount each month. This contribution does not include the Franchisee's cost for their Yellow Pages display ad;

        (2)     Franchisee shall submit to the Advertising Cooperative and to Franchisor such statements and reports as may be required by Franchisor or by the Advertising Cooperative. All contributions to the Advertising Cooperative shall be maintained and administered in accordance with procedures adopted by the Advertising Cooperative and approved by Franchisor; and

        (3)     No advertising or promotional plans or materials may be used by the Advertising Cooperative or furnished to its members without the prior approval of Franchisor.

        C.     Franchisee shall place and pay to the local directory , the cost of a quarter page or larger Yellow Pages display ad in Franchisee's local market area or, to the extent other FASTSIGNS centers are located in such area, Franchisee's pro rata share of the cost of the display ad or listing. To the extent more than one telephone company or directory service publishes display ads for Franchisee's local market area, Franchisor shall designate the primary directory in which Franchisee's display ad shall be published. If Franchisor determines that Franchisee's participation in a display ad in another directory serving a related market area would be beneficial to Franchisee and the System and other FASTSIGNS centers are located in such related market area, Franchisee shall also pay its pro rata share of the cost of such additional ad. Franchisee shall use Franchisor's recommended Yellow Pages display ad. In the event Franchisee desires to use a Yellow Pages display ad not prepared by Franchisor, Franchisee shall submit such Yellow Pages display ad to Franchisor for approval. Franchisor shall provide Franchisee with approval or disapproval within five business (5) days from the date of receipt thereof by Franchisor. Franchisee shall list the Yellow Pages display ad under the Signs heading and any other heading deemed appropriate by Franchisor in any and all directories Franchisee advertises in. If more than one franchisee is advertising in a directory, Franchisee shall place a joint display ad with each franchisee paying their pro rata share of the cost of the joint display ad. Franchisee shall not obtain in any directory, advertise or otherwise solicit business through the use of a national long distance toll free telephone number. By obtaining Franchisor's prior written approval, Franchisee may advertise or otherwise solicit business through use of a regional long distance toll free number, remote call forwarding number or a listing for a future Center (the "number"). If permission is granted for Franchisee to obtain a number, Franchisee must use it as determined by Franchisor and relinquish the number at Franchisor's request.

        D.     Upon the execution of this Agreement or at any time thereafter, Franchisee shall, at the option of Franchisor, execute such forms and documents as Franchisor deems necessary, including, but not limited to Attachment "E" to this Agreement to appoint Franchisor its true and lawful attorney-in-fact with full power and authority for the sole purpose of assigning to Franchisor all rights to the telephone numbers of the Center and any related and other business listings upon material default of Section 4.C. of this Agreement, or termination or expiration of this Agreement as required under Section 4.

        E.     Franchisor may from time to time develop and administer other advertising programs designed to promote the entire System. Franchisee shall have the right to participate in such programs, but only in full compliance with the terms established by Franchisor for each such program.

F.      All advertising and promotion by Franchisee in any medium shall be conducted in a dignified manner and shall conform to the standards and requirements of Franchisor as set forth in the Manuals (as defined in Section 14.A.) or otherwise. Franchisee shall obtain Franchisor's approval of all advertising and promotional plans and materials prior to use if such plans and materials have not been prepared by Franchisor or previously approved by Franchisor within the immediately preceding one (1) year period. Franchisee shall submit such unapproved plans and materials to Franchisor, and Franchisor shall approve or disapprove such plans and materials within five (5) business days from the date of receipt thereof by Franchisor. Franchisee shall not use such unapproved plans or materials until they have been approved by Franchisor. Franchisee shall promptly discontinue use of any advertising or promotional plans or materials, whether or not previously approved, upon notice from Franchisor.

G.      From time to time during the term of the Agreement, the NAC may, on behalf of the System, obtain accounts from national companies that fulfill their needs for signs on a local basis and from a centrally coordinated service ("National Accounts"). Under the national accounts program ("NAP"), the NAC will negotiate and execute agreements with National Accounts customers (the "Customers") and will organize and administer the NAP. The NAP acts as a central access point through which the Franchisee can effectively meet the needs of the Customers. The NAP conforms to the individual needs of each customer by designing a customer tailored system for the Customer's ordering, production, distribution, and invoicing. Franchisee will be permitted to participate in the NAP; provided, Franchisee meets and complies with the NAC's criteria and standards for participating in such a program (which includes being in compliance with the terms of this Agreement), executes such form of participation agreement and other documents required by the NAC, and agrees to provide the services under the terms and conditions negotiated by the NAC. The Franchisor does not represent that the Franchisor or the NAC will obtain any national accounts in the Franchisee's Territory (as defined in Section 1.C.). If, however, the NAC does obtain such accounts, the NAC will advise Franchisee of the terms of such participation and offer Franchisee the option to participate. Participation in the NAP is voluntary on the part of Franchisee and may be terminated by Franchisee or by the NAC in accordance with the terms of the participation agreement.

H.      Franchisee shall have the right to sell its products and offer services at any prices Franchisee may determine, with the exception of NAP orders.

I.      Upon the execution of this Agreement or at any time thereafter, Franchisee shall, at the option of Franchisor, execute such forms and documents as Franchisor deems necessary, including, but not limited to Attachment F to this Agreement to appoint Franchisor its true and lawful attorney-in-fact with full power and authority for the sole purpose of assigning to Franchisor all rights to any web sites, web pages, listings, banners, URLs, advertisements or other services and links related to Franchisee's business or use of Franchisor's trademarks, service marks or other logos, on or with the Internet, World Wide Web, Internet service providers, electronic mail services, electronic communication providers, search engines or other similar services upon the termination or expiration of this Agreement as required under Section 4. Franchisee shall execute such other documents required by Franchisor to effect this provision. Franchisee agrees that it has no authority to and shall not establish any web sites or listings on the Internet or World-Wide-Web without the express written consent of Franchisor. Franchisee shall use Franchisee's assigned fastsigns.com e-mail address in any Yellow Pages display ad or any other marketing materials.

5.      **Franchisee Organization**

A.      In the event Franchisee is a corporation, a partnership or a limited liability company, Franchisee and the Controlling Principals represent, warrant, and covenant that:

(1)     Franchisee is duly organized and validly existing under the state law of its formation;

(2)     Franchisee is duly qualified and is authorized to do business in each jurisdiction in which its business activities or the nature of the properties owned by it require such qualification;

FAREV3.03

-7-

(3)     Franchisee's corporate charter or written partnership agreement shall at all times provide that the activities of Franchisee are confined exclusively to the development and operation of FASTSIGNS centers under the System unless otherwise consented to by Franchisor in writing;

(4)     The execution of this Agreement and the transactions contemplated hereby are within Franchisee's corporate power if Franchisee is a corporation or limited liability company, or if Franchisee is a partnership, are authorized under Franchisee's written partnership agreement and have been duly authorized by Franchisee;

(5)     If Franchisee is a corporation or a limited liability company, copies of Franchisee's articles of incorporation, bylaws, stock certificates, other governing documents, any amendments to the foregoing, and resolutions of the Board of Directors authorizing entry into and performance of this Agreement shall be furnished to Franchisor prior to the execution of this Agreement; or, if Franchisee is a partnership, copies of the written partnership agreement, other governing documents, and any amendments to the foregoing, shall be furnished to Franchisor prior to the execution of this Agreement, including evidence of consent or approval of the entry into and performance of this Agreement by the requisite number or percentage of partners, if such approval or consent is required by Franchisee's written partnership agreement;

(6)     If Franchisee is a corporation, partnership or limited liability company, the ownership interests in Franchisee are accurately and completely described in Attachment "B". Further, if Franchisee is a corporation, Franchisee shall maintain at all times a current list of all owners of record and all beneficial owners of any class of voting securities in Franchisee or, if Franchisee is a partnership, all current owners of an interest in the partnership.  In the event there is a change in the information contained in Attachment "B", Franchisee agrees to provide such information to Franchisor within five (5) days subsequent to any such change and to execute any documents deemed necessary by Franchisor to amend Attachment "B" in order to reflect such changes.  Franchisee shall make its listings available to Franchisor upon request; and

(7)     If Franchisee is a corporation or a limited liability company, Franchisee shall maintain stop-transfer instructions against the transfer on its records of any of its equity securities and each stock certificate of the corporation shall have conspicuously endorsed upon it a statement in a form satisfactory to Franchisor that it is held subject to and that the further assignment or transfer thereof is subject to all restrictions imposed upon assignments by this Agreement; provided, however, that the requirements of this Section 5.A.(7) shall not apply to the transfer of equity securities of a publicly-held corporation.  If Franchisee is a partnership, its written partnership agreement shall provide that ownership of an interest in the partnership is held subject to and that further assignment or transfer is subject to all restrictions imposed upon assignments by this Agreement.

(8)     If, after the execution of this Agreement, any person ceases to qualify as one of Franchisee's Principals (defined in Section 27.E.) or if any individual succeeds to or otherwise comes to occupy a position which would, upon designation by Franchisor, qualify him as one of Controlling Principals, Franchisee shall notify Franchisor within five (5) days after any such change and, upon designation of such person by Franchisor as one of Franchisee's Principals or as a Controlling Principal, as the case may be, such person shall execute such documents and instruments (including, as applicable, this Agreement) as may be required by Franchisor to be executed by others in such positions; and

(9)     Franchisee's Principals (as defined in Section 27.E.) shall each execute and bind themselves to the confidentiality and non-competition covenants set forth in the Confidentiality Agreement and Ancillary Covenants Not to Compete which forms Attachment "D" to this Agreement (see Sections 15.B. and 19.I.).  The Controlling Principals shall, jointly and severally, guarantee Franchisee's performance of all of Franchisee's obligations, covenants and agreements hereunder pursuant to the terms and conditions of the guaranty contained herein, and shall otherwise bind themselves to the terms of this Agreement as stated herein.

FAREV3.03                                      -8-

B.      Franchisee and the Controlling Principals acknowledge and agree that the representations, warranties and covenants set forth above in Section 5.A.(1)-(9) are continuing obligations of Franchisee and the Controlling Principals, as applicable, and that any failure to comply with such representations, warranties and covenants shall constitute a material event of default under this Agreement. Franchisee and the Controlling Principals will cooperate with Franchisor in any efforts made by Franchisor to verify compliance with such representations, warranties and covenants.

6.      <u>Site Selection: Lease; Plans and Construction</u>

A.      Franchisee assumes all cost, liability, expense, and responsibility for locating, obtaining, and developing a site for any Center to be established under this Agreement and for constructing and equipping the Center at such site. Franchisee shall not make any binding commitment to a prospective vendor or lessor of real estate with respect to a site for a Center unless the site is approved in accordance with the procedure herein set forth. Franchisee acknowledges that Franchisor's approval of a prospective site or the rendering of assistance in the selection of a site does not constitute a representation, promise, warranty or guarantee by Franchisor that a Center operated at that site will be profitable or otherwise successful.

B.      Within sixty (60) days after execution of this Agreement or any extended time period approved by Franchisor in writing, Franchisee shall acquire, at Franchisee's expense, a location for the Center at a site approved by Franchisor as hereinafter provided.

C.      (1)      Prior to acquisition of a site for the Center and within thirty (30) days after execution of this Agreement, Franchisee shall locate three (3) potential sites for the Center which satisfies Franchisor's site selection criteria and shall submit to Franchisor in the form specified by Franchisor a description of the three sites, together with such other information and materials as Franchisor may reasonably require. Franchisor shall review Franchisee's proposed sites based upon an analysis of local competitors, demographics, visibility, accessibility and suitability of the premises and other relevant factors. A representative of Franchisor shall travel, subject to availability, to Franchisee's proposed sites for an on-site evaluation of the sites for the Center developed pursuant to this Agreement. Franchisor may withhold approval of a site for any <u>bona fide</u> reason that Franchisor, in the exercise of its reasonable business judgment, deems necessary. All costs incurred by Franchisor's representative for such on-site evaluation for the Center premises developed hereunder shall be paid by Franchisor; provided, if Franchisee must relocate the Center for any reason, all such costs incurred by Franchisor's representative for site selection activities associated with such relocation shall be paid by Franchisee. Franchisee shall also pay all costs incurred for any additional on-site evaluations, if deemed necessary by Franchisor or requested by Franchisee.

(2)      If Franchisee is to occupy the premises of the Center under a lease, Franchisee shall submit to Franchisor the lease prior to its execution for Franchisor's approval and shall furnish to Franchisor a copy of the executed lease within ten (10) days after execution thereof. Any lease for the Center premises shall contain substantially the terms and provisions set forth in Attachment "C" to this Agreement, except as Franchisor may otherwise consent to in writing. Franchisee is not permitted to operate the Center under a month-to-month lease without Franchisor's prior written approval. If Franchisee is to purchase the premises for the Center, Franchisee shall submit the contract of sale to Franchisor for approval prior to its execution and shall furnish to Franchisor a copy of the executed contract of sale within ten (10) days after execution thereof.

(3)      Failure by Franchisee to acquire the site for the Center within the time period prescribed above (including any extensions approved by Franchisor) and in accordance with the terms of this Agreement shall constitute a material default hereunder.

(4)      Following the approval by Franchisor and the acquisition by Franchisee of a location for the Center pursuant to this Section 6., the location shall be described in Attachment "A" to this Agreement.

D.      Franchisee shall be responsible for obtaining and maintaining all zoning classifications and clearances which may be required by state, provincial, or local laws, ordinances, or regulations or which may be necessary or advisable as a result of any restrictive covenants relating to the Center premises.  Franchisee shall obtain all permits, licenses, and certifications required for the lawful construction and operation of the Center.  In addition, prior to the commencement of the construction or finish-out of the Center, Franchisee shall certify in writing to Franchisor that the insurance coverage specified in Section 10. is in full force and effect and that all required approvals, clearances, permits, and certifications have been obtained.  Upon request, Franchisee shall provide to Franchisor additional copies of Franchisee's insurance policies or certificates of insurance and copies of all such approvals, clearances, permits, and certifications.

E.      Franchisor provides the FASTSIGNS construction drawings, including all specifications for the construction of the Center.  These drawings will be supplied in a reproducible sepia format to allow Franchisee to make blueline prints.  Franchisor will supply additional drawings, revisions and required forms.  Franchisor will not charge Franchisee for the cost of the first revision to the drawings. Franchisor will charge Franchisee for the costs of additional revisions to the drawings.  Franchisor will attempt to obtain any architectural seals required by local city ordinances and charge Franchisee for those and/or any out-of-pocket costs.  Any engineering drawings required by local ordinances are Franchisee's responsibility.

F.      Franchisee shall independently secure the services of a qualified, licensed general contractor to construct the Center and complete all improvements thereto.  If Franchisee must relocate the Center for any reason and Franchisor determines that the plans produced by the architectural firm selected by Franchisee for construction of the Center are not consistent with Franchisor's standards and specifications, Franchisor may prohibit the implementation of such plans or any part thereof. Franchisor shall notify Franchisee within thirty (30) days of receiving the architectural design plans for review that it objects to such plans.  In the event Franchisor objects to any such plans, it shall provide Franchisee with a reasonably detailed list of changes necessary to make the plans acceptable.  Franchisor shall, upon a resubmission of the plans with such changes, notify Franchisee within fifteen (15) days of receiving the resubmitted plans whether the plans are acceptable.  Except as provided in Section 6.E. above, preparation of such architectural plans and any revisions thereto shall be at Franchisee's expense. Construction of the Center shall be at Franchisee's expense.  Franchisee shall diligently pursue construction of the Center.  During the time of construction and completion of improvements, Franchisee shall provide Franchisor with weekly reports regarding the progress of such work as may be reasonably requested by Franchisor and in such form as required by Franchisor.  In addition, Franchisor shall have the right to make such on-site inspections during the time of construction as it may deem reasonably necessary to evaluate Franchisee's progress.  Franchisee shall notify Franchisor of the scheduled date for completion of construction and all improvements no later than thirty (30) days prior to such date.  Within a reasonable time after the date of completion of construction, Franchisor shall, at its option, conduct an inspection of the completed Center and its premises.  Franchisee acknowledges and agrees that Franchisee will not open the Center for business without the written authorization of Franchisor.

G.      Franchisee acknowledges that time is of the essence.  Subject to Franchisee's compliance with the pre-opening obligations described in Sections 6. and 8., Franchisee shall open the Center and commence business within one hundred twenty (120) days following the date of execution of this Agreement unless Franchisee obtains an extension of such time period from Franchisor.  Franchisor shall have the right to prohibit Franchisee from commencing operation of the Center in the event Franchisee fails to comply with such pre-opening obligations.  The foregoing will not apply in the event this Agreement is entered into pursuant to the Development Agreement in which case Franchisee shall open the Center in accordance with the schedule provided therein.

7.      **Duties of Franchisor**

A.      Franchisor shall provide site selection assistance as set forth in Section 6.

B.       Franchisor shall provide Franchisee specifications and standards for the construction and design of a Center as provided in Section 6.

C.       Prior to the opening of the Center, Franchisor shall provide an initial training program for Franchisee, if Franchisee is an individual, or if Franchisee is a corporation or partnership, for one of the Controlling Principals (as defined in Section 27.E.) and the General Manager (or designated personnel) in accordance with Section 8. and shall make available such other training programs as it deems appropriate.

D.       In connection with the opening of the Center, Franchisor's franchise business consultant ("FBC") shall provide on-site pre-opening and opening training, supervision and assistance to Franchisee during the first week the Center is open for business. Except as set forth below, the FBC shall be provided at no expense to Franchisee. If construction of the Center is not completed at the time the FBC arrives for the opening of the Center, Franchisee shall pay the expenses incurred by the FBC including, without limitation, the costs of travel, lodging, meals and wages. Franchisee shall schedule another trip at a time when construction of the Center is complete, which trip shall be at no expense to Franchisee. Additionally, for any replacement Center established by Franchisee in connection with any Development Agreement pursuant to which this Agreement is executed, or in accordance with Section 16.B.(5) hereof as a result of an event of Force Majeure, Franchisor may, in its sole discretion, charge a reasonable fee for such opening assistance.

E.       In addition to the assistance rendered Franchisee prior to opening, Franchisor shall provide advisory assistance in the management and operation of the Center as Franchisor deems advisable. Franchisor shall provide such assistance by means of toll free telephone service and, at the request of Franchisee or, if Franchisor deems necessary, through on-site visits by Franchisor's FBC. Franchisor shall, at its expense, provide on-site assistance not less than two (2) times every twelve (12) months during the term of this Agreement with the first such time period commencing immediately following the initial week the Center is open for business, or Franchisee can substitute a designated training program in exchange for one (1) on-site visit. If additional visits are requested by Franchisee, all costs and expenses incurred by Franchisor's representatives for such on-site assistance including, without limitation, the costs of travel, lodging, meals and wages, shall be paid by Franchisee unless Franchisor, in its sole discretion, agrees to pay such costs and expenses.

F.       Franchisor shall administer the NAC Fund and any Advertising Cooperative in accordance with Sections 3.D. and 4.B.

G.       Franchisor shall provide Franchisee, on loan, one copy of the Manuals (as defined in Section 14.A).

H.       Franchisor shall, from time to time, conduct meetings, seminars and other related activities regarding the System for franchisees generally, which Franchisee is highly encouraged to attend. Except as approved by Franchisor, any costs incurred by Franchisee, Franchisee's Principals or Center personnel in attending such events shall be the responsibility of Franchisee.

I.       Franchisor shall provide Franchisee with the terms and conditions applicable to the purchase of its store graphics package and menu board graphics and for other fixtures, panel saw, panel saw, substrate cutter, power trimmer, plotter, printer, laminator, equipment, computers, supplies, exhibit(s) and display(s) and merchandise that Franchisee shall purchase from Franchisor and other approved or designated suppliers for use at the Center.

J.       Franchisor shall submit, on behalf of Franchisee, the opening inventory order. In conjunction with the NAC, Franchisor shall make available printing and mailing services for the Center at a reasonable cost, as provided in Section 3.D.(1).

K.      Franchisor shall seek to maintain the high standards of quality and service of the System, and, accordingly, shall conduct, as it deems advisable, inspections of the Center and evaluations of the products sold and services rendered therein.

L.      In the event a General Manager employed by Franchisee terminates employment with Franchisee to open a Center and has an ownership interest in said Center, Franchisee will be entitled to compensation at an amount equal to 1% of the new Center's gross sales during its first year of operation, payable quarterly, which amount will be paid by Franchisor. Such amount represents compensation for the reasonable costs and expenses incurred by the Franchisee in connection with the training of such employee and shall not constitute payment for any broker or salesperson fees, nor shall Franchisor and Franchisee be deemed to create such a relationship by the payment of such fee.

**8.      Training**

Franchisee acknowledges that it is necessary to the continued operation of the System and the Center that Franchisee and Center personnel receive such training as specified in the Manuals or as Franchisor may require, and, accordingly, agrees as follows:

A.      Prior to the opening of the Center, Franchisee, if Franchisee is an individual, or a Controlling Principal (with not less than a twenty-five percent (25%) interest in Franchisee, or a controlling interest if less than twenty-five percent (25%)) and the General Manager (as defined in Section 9.B.) (or such other designated personnel that Franchisor approves) shall attend and complete, to Franchisor's satisfaction, Franchisor's initial training program. In addition, Franchisee's computer graphic designer shall attend and complete to Franchisor's satisfaction, Franchisor's initial training program. Franchisee may, upon Franchisor's approval, permit other Center personnel to attend the initial training program. The initial training program shall include inspection of one or more existing FASTSIGNS centers, discussion and implementation of a grand-opening advertising program and training of Center personnel in the sales, administrative and financial aspects of the operation of the Center and in the use of sign-making and digital imaging equipment. Training shall be for such period of time as Franchisor deems reasonably necessary and shall be conducted at Franchisor's corporate offices or such other location determined by Franchisor. If the training program is not satisfactorily completed by Franchisee, the Controlling Principal attending training or the General Manager (or such other designated personnel), Franchisee shall designate a replacement to satisfactorily complete such training. Franchisor shall have the right to prevent Franchisee from opening the Center for business until the persons designated herein successfully complete the initial training program. During the remaining term of this Agreement, any successor General Manager shall, and any other personnel employed by Franchisee may be required by Franchisor to, attend and complete to Franchisor's satisfaction, Franchisor's initial training program. Any successor General Manager shall complete Franchisor's initial training program within sixty (60) days from designation as the replacement General Manager. Franchisor reserves the right to impose a training fee for such additional training, including training for any replacement General Manager. Notwithstanding the foregoing, if the Center is opened pursuant to a Development Agreement, the General Manager shall not be required to attend and complete Franchisor's initial training program if such General Manager has been employed by Franchisee or its affiliate in a management position at another FASTSIGNS center for four (4) or more months prior to the opening of such Center.

B.      Franchisee, Franchisee's Principals and the General Manager may attend such additional training programs and seminars as Franchisor may offer from time to time. At Franchisor's discretion, such additional training shall be mandatory. For all such programs and seminars, Franchisor will provide the instructors and training materials; however, Franchisor reserves the right to impose a reasonable fee for such additional training programs and seminars.

C.      Franchisee, a Controlling Principal or the General Manager shall attend the annual franchisee convention once within every three (3) year period from the date of this Agreement.

FAREV3.03                                                    -12-

D.      Franchisee shall be solely responsible for all costs and expenses incurred by Franchisee, Franchisee's Principals or personnel attending any training programs, the annual franchisee conventions, and any other meetings and seminars including, without limitation, costs of travel, lodging, meals and wages.

9.      **Center Operations**

A.      Franchisee shall use the Center premises solely for the operation of the Center, shall maintain business hours as provided in the Manuals (as defined in Section 14.A.) or as Franchisor shall specify from time to time in writing, and shall refrain from using or permitting the use of the Center premises for any other purpose or activity at any time without first obtaining the written consent of Franchisor.

B.      Franchisee, if Franchisee is an individual, or a Controlling Principal (with not less than a twenty-five percent (25%) interest in Franchisee, or a controlling interest, if less than twenty-five (25%)) and who is acceptable to Franchisor, shall supervise the Center and devote his full time, best efforts and constant personal attention to the day-to-day operations of the Center for not less than the first six months the Center is open for business. In addition, Franchisee shall designate, in writing, an individual (the "General Manager") who will assist Franchisee or the Controlling Principal, as the case may be, in the management of the Center (and/or who will devote his full time, best efforts and constant personal attention to the day-to-day operations of the Center in the event Franchisee or Controlling Principal does not participate in the full-time operation of the Center after the initial six-month period the Center is open). Also, Franchisee shall designate in writing, an individual who will be Franchisee's production employee. The General Manager may be any of Franchisee's Principals or an employee of Franchisee. The General Manager shall satisfactorily complete Franchisor's initial training program; shall satisfy Franchisor's educational or business experience criteria in effect for General Managers in the System as of the time the General Manager is designated; and shall otherwise be an individual acceptable to Franchisor. If at any time during the term of this Agreement the General Manager is not able to continue to serve in such capacity or no longer qualifies to act as such in accordance with this Section 9.B, Franchisee shall promptly notify Franchisor and shall designate a replacement General Manager within thirty (30) days after the General Manager ceases to serve, such replacement being subject to the same qualifications listed above. The replacement General Manager shall attend and complete Franchisor's initial training program within sixty (60) days from designation as the replacement General Manager. Franchisee shall provide for interim management of the Center until the replacement is designated, such interim management to be conducted in accordance with the terms of this Agreement.

C.      Franchisee shall maintain competent, conscientious and trained personnel to operate the Center in accordance with this Agreement and the Manuals and shall take such steps as are necessary to ensure that its employees maintain good customer relations.

D.      Franchisee and the Controlling Principals understand that compliance by all franchisees operating under the System with Franchisor's training and operational requirements is an essential and material element of the System and that Franchisor and franchisees operating under the System consequently expend substantial time, effort, and expense in training its personnel. Accordingly, Franchisee and the Controlling Principals agree that if during the term of this Agreement, Franchisee or any Controlling Principal shall designate as General Manager, Customer Service Representative, Inside Sales Representative, Computer Graphic Designer, or Outside Sales Representative who is at the time or was at any time during the prior six (6) months employed in a similar position by Franchisor or any of its subsidiaries or affiliates, , Franchisor shall be entitled to be compensated for the reasonable costs and expenses incurred by Franchisor in connection with the training of such individual. The parties agree that such expenditures may be uncertain and difficult to ascertain and therefore agree that the compensation specified herein reasonably represents such expenditures and is not a penalty. An amount equal to two months of the person's monthly salary, including monthly commissions and/or bonus at the time of the termination of his employment with Franchisor shall be paid by Franchisee prior to such individual assuming the position. In seeking an individual to serve in the capacities described above, Franchisee and the Controlling Principals shall not discriminate in any manner whatsoever against any individual, the

FAREV3.03                                                    -13-

employment of whom by Franchisee is subject to the provisions of this Section 9.D., on the basis of the compensation required to be paid by Franchisee hereunder in the event of the employment by Franchisee or any Controlling Principal of such individual. The parties hereto expressly acknowledge and agree that no current or former employee of Franchisor or its subsidiaries and affiliates under the System shall be a third party beneficiary of this Agreement or any provision hereof, excluding only the covenant of Franchisee set forth in the preceding sentence. Franchisor hereby expressly disclaims any representations and warranties regarding the performance of any employee or former employee of Franchisor or its subsidiaries and affiliates, or any franchisee operating under the System, who is designated as General Manager or employed by Franchisee or any of the Controlling Principals in any other capacity, and Franchisor shall not be liable for any losses, of whatever nature or kind, incurred by Franchisee or such Controlling Principal in connection therewith.

E.    To ensure that the highest degree of quality and service is maintained, Franchisee shall operate the Center in strict conformity with such methods, standards and specifications as Franchisor may from time to time prescribe in the Manuals or otherwise in writing. Franchisee further agrees:

(1)    To offer for sale and sell at the Center all products and services required by Franchisor and to provide such products and services in the manner and style prescribed by Franchisor;

(2)    To offer for sale and sell only products and services expressly approved for sale in writing by Franchisor; to refrain from deviating from Franchisor's standards and specifications without Franchisor's prior written consent; and to discontinue offering for sale and selling any product or service which Franchisor disapproves in writing at any time;

(3)    To purchase the store graphics package from Franchisor or its designated supplier and install such equipment and items, at Franchisee's expense, at the Center; and to purchase or lease and install, at Franchisee's expense, the panel saw, substrate cutter, power trimmer, the signmaking computer, plotter, printer, laminator, point-of-sale computer system, exhibits and displays and all other fixtures, furnishings, equipment, decor items, and signs which conform to Franchisor's standards and specifications as Franchisor may reasonably direct from time to time in the Manuals or otherwise in writing and refrain from installing or permitting to be installed on or about the Center premises, without Franchisor's prior written consent, any fixtures, furnishings, equipment, decor, signs, or other items not previously approved by Franchisor. If any of the property described above is leased by Franchisee from a third party, such lease must be approved by Franchisor, in writing, prior to execution. At Franchisor's option, Franchisor may request that said lease contain a provision, which permits any interest of Franchisee in the lease to be assigned to Franchisor upon the termination or expiration of this Agreement and which prohibits the lessor from imposing an assignment or related fee upon Franchisor in connection with such assignment;

(4)    To purchase the opening inventory order and to obtain store fixtures from Franchisor's designated suppliers and to obtain all products, equipment, signs, interior and exterior decor items, furnishings, supplies and other materials required for operation of the Center solely from suppliers (including manufacturers, distributors and other sources) who demonstrate, to Franchisor's continuing reasonable satisfaction, the ability to meet Franchisor's then-current standards and specifications for such items and who possess adequate quality controls and capacity to supply Franchisee's needs promptly and reliably, and who have been approved in writing by Franchisor and not thereafter disapproved.

(5)    If Franchisee desires to purchase, lease or use products from a supplier who has not been previously approved by Franchisor, Franchisee shall submit to Franchisor a written request for such approval or may request the supplier to do so. Franchisee shall not purchase or lease from any supplier until and unless such supplier has been approved in writing by Franchisor. Franchisor's representatives shall be permitted to inspect the supplier's facilities, and to require that samples from the supplier be delivered, at Franchisor's option, either to Franchisor or to an independent firm designated by Franchisor for testing. Franchisor may impose a charge on Franchisee or the supplier for the costs of any such tests. Franchisor reserves the right, at its option, to reinspect the facilities and products from time to time and to revoke its approval upon the supplier's failure to continue to meet any of Franchisor's

then-current criteria. Notwithstanding the foregoing, Franchisor shall not be required to approve any particular supplier.

F.     Franchisee shall require all advertising and promotional materials, signs, decorations, paper goods (including forms, stationery and business cards) and other items, which may be designated by Franchisor to bear the Proprietary Marks in the form, color, location and manner prescribed by Franchisor.

G.     Franchisee shall, at Franchisee's sole cost and expense, maintain the Center in the highest degree of repair and condition and in conformity with the standards, specifications, and requirements of the System, as the same may be designated by Franchisor from time to time. Franchisee specifically agrees to repair or replace, at Franchisee's cost, equipment, signs, interior and exterior decor items, fixtures, furnishings, supplies, and other products and materials required for the operation of the Center as necessary or desirable, and to obtain, at Franchisee's cost, any new or additional equipment, fixtures, supplies, and other products and materials which may be reasonably required by Franchisor in order for Franchisee to offer and sell products or services from the Center. Except as may be expressly provided in the Manuals, no alterations or improvements, or changes of any kind in design, equipment, signs, interior, or exterior decor items, fixtures or furnishings shall be made in or about the Center or Center premises without the prior written approval of Franchisor in each instance.

H.     In order to assure the continued success of the Center, Franchisee shall, upon the request of Franchisor, modernize the Center premises, equipment, signs, interior, and exterior decor items, fixtures and furnishings required for the operation of the Center, to Franchisor's then-current standards and specifications; however, Franchisee shall not be required to undertake a material modernization of the Center that exceeds twenty thousand dollars ($20,000) within any three (3) year period during the term of this Agreement, except, however, the twenty thousand dollar ($20,000) limitation shall not apply to the purchase of equipment necessary to offer new and additional services provided in Section 9.G. above. Franchisee's obligations under this Section 9.H. are in addition to, and shall not relieve Franchisee from, any of its other obligations under this Agreement, including those contained in the Manuals.

I.     Franchisee shall grant Franchisor and its representatives and agents the right to enter upon the Center premises at any time for the purpose of conducting inspections of the Center and its operations, and Franchisee shall cooperate with Franchisor's representatives and agents in such inspections by rendering such assistance as they may reasonably request and, upon notice from Franchisor or its representatives and agents and without limiting Franchisor's other rights under this Agreement, Franchisee shall take such steps as may be necessary to correct immediately any deficiencies detected during any such inspection. Should Franchisee, for any reason, fail to correct such deficiencies within a reasonable time as determined by Franchisor, Franchisor shall have the right and authority (without, however, any obligation to do so), to correct such deficiencies and to charge Franchisee a reasonable fee for Franchisor's expenses in so acting, payable by Franchisee immediately upon demand.

J.     Franchisee shall comply with all other requirements set forth in this Agreement.

10.    <u>Insurance</u>

A.     Franchisee shall procure, prior to commencing construction of the Center, and shall maintain in full force and effect during the term of this Agreement, and any renewal hereof, at Franchisee's expense, an insurance policy or policies protecting Franchisee, Franchisee's Principals and Franchisor and its subsidiaries, affiliates, successors and assigns, and their respective directors, officers, shareholders, partners, employees, agents and representatives, against any demand or claim relating to personal injury, death, property damage or any loss, liability or expense whatsoever arising or occurring upon or in connection with the Center or by reason of the construction, operation or occupancy of the Center, as well as such other insurance applicable to such other special risks, if any, as Franchisor may reasonably require for its own and Franchisee's protection.

B.      Such policy or policies shall be written by an insurance company approved by Franchisor and shall include, at a minimum (except as additional coverage and higher policy limits may reasonably be specified for all franchisees, from time to time, by Franchisor in the Manuals or otherwise in writing), the following insurance coverage and policy limits:

(1)      Comprehensive general liability insurance, including personal injury coverage, property damage coverage, products liability coverage and fire and storm damage coverage, with primary and excess limits of not less than One Million Dollars ($1,000,000);

(2)      Motor vehicle liability insurance, including coverage of vehicles not owned by Franchisee but used by employees in connection with the Center, with a combination of primary and excess limits of not less than One Million Dollars ($1,000,000);

(3)      Employer's liability and workers' compensation insurance in amounts provided by applicable law or, if permissible under applicable law, and with respect to workers' compensation, any legally appropriate alternative providing substantially similar compensation for injured workers satisfactory to Franchisor, provided that Franchisee (i) maintains an excess indemnity or "umbrella" policy covering employer's liability and/or a medical/disability policy covering medical expenses for on the job accidents, which policy or policies shall contain such coverage amounts as Franchisee and Franchisor shall mutually agree upon and (ii) conducts and maintains a risk management and safety program for its employees as the Franchisee and Franchisor shall mutually agree is appropriate. Such policies shall also include a waiver of subrogation in favor of Franchisor and its directors, officers, shareholders, partners, employees, representatives, independent contractors and agents; and

(5)      Other insurance which may be required by statute or rule of the state or locality in which the Center is located.

C.      Franchisee's obligation to obtain and maintain the policy or policies in the amounts specified in Section 10.B. shall not be limited in any way by reason of any insurance which may be maintained by Franchisor, and each such insurance policy shall provide that the proceeds thereof shall not be reduced by any amount payable or paid to Franchisor under any policy procured and maintained by Franchisor, nor shall Franchisee's performance of that obligation relieve it of liability under the indemnity provisions set forth in Section 20. hereof.

D.      All public liability, property damage, and motor vehicle liability policies shall contain a provision that Franchisee's insurance coverage shall be primary to any coverage maintained by Franchisor and Franchisor shall be entitled to recover under Franchisee's policies for any loss occasioned to Franchisor, its subsidiaries, affiliates, successors and assigns, and their respective officers, directors, shareholders, employees, servants, agents, or representatives for whatever reason.

E.      Not later than fifteen (15) days prior to the date construction of the Center premises is to commence and, thereafter, at least thirty (30) days prior to the expiration of any such policy, Franchisee shall deliver to Franchisor Certificates of Insurance and, if requested by Franchisor, copies of the applicable insurance policies evidencing the proper coverage with limits not less than those required hereunder. All insurance policies and Certificates required hereunder, with the exception of workers' compensation, shall name Franchisor, its subsidiaries, affiliates, successors and assigns and their respective officers, directors, shareholders, employees, servants, agents, and representatives as additional insureds, and shall expressly provide that any interest of same therein shall not be affected by any breach by Franchisee of any policy provisions. Further, all insurance policies and Certificates shall expressly provide that no less than thirty (30) days' prior written notice shall be given to Franchisor in the event of a material alteration to or cancellation of the policies. Nonsubscribers of Workers' Compensation (as permitted by law) shall provide Franchisor with proof of substitute coverage.

F.      Should Franchisee, for any reason, fail to procure and maintain the insurance coverage required by this Agreement or fail to provide proof of such insurance upon request by Franchisor, Franchisor shall have the right, at its option, to procure such insurance and to charge same to Franchisee,

FAREV3.03                                      -16-

which charges, together with a reasonable fee for Franchisor's expenses in so acting, shall be payable by Franchisee immediately upon notice. The foregoing rights and remedies shall be in addition to any other remedies Franchisor may have.

G.        It is recommended by Franchisor that Franchisee procure garage keeper's comprehensive insurance, which provides coverage of theft or vandalism of vehicles that are owned by customers that Franchisee is providing service to with limits of not less than Twenty Five Thousand Dollars ($25,000) per vehicle. It is also recommended by Franchisor that Franchisee procure loss/interruption of business insurance.

11.    Taxes, Permits and Indebtedness

A.        Franchisee shall promptly pay when due all taxes levied or assessed, including, without limitation, unemployment and sales taxes, and all trade and other accounts and indebtedness of every kind incurred by Franchisee in the conduct of the business franchised under this Agreement.

B.        Franchisee shall pay to Franchisor an amount equal to any sales tax, gross receipts tax, excise tax or any license or tax similar thereto, directly or indirectly, imposed on Franchisor with respect to any payment to Franchisor required under this Agreement. The preceding sentence shall not apply to any franchise tax or income, war profits or excess profits tax (or any tax in lieu thereof) imposed on Franchisor with respect to the aforesaid payments.

C.        In the event of any bona fide dispute as to Franchisee's liability for taxes assessed or other indebtedness, Franchisee may contest the validity or the amount of the tax or indebtedness in accordance with the procedures of the taxing authority or applicable law; however, in no event shall Franchisee permit a tax sale or seizure by levy of execution or similar writ or warrant, or attachment by a creditor, to occur against the premises of the Center, or any improvements thereon.

D.        Franchisee shall comply with all federal, state and local laws, rules and regulations, and shall timely obtain any and all permits, certificates, or licenses necessary for the full and proper conduct of the Center, including, without limitation, licenses to do business, fictitious name registrations, sales tax permits and fire clearances and shall promptly provide Franchisor with copies of the same in accordance with Section 6.D. and promptly thereafter as new or modified permits, licenses or certificates are obtained.

E.        Franchisee shall notify Franchisor in writing within five (5) days of the commencement of any action, suit, or proceeding, and of the issuance of any order, writ, injunction, award, or decree of any court, agency, or other governmental instrumentality, which may adversely affect the operation or financial condition of the Center.

12.    Records and Reports

A.        Franchisee shall maintain during the term of this Agreement full, complete and accurate books, records and accounts including, without limitation, sales slips, purchase orders, invoices, payroll records, bank statements, and cash receipts and disbursements journals and ledgers in accordance with generally accepted accounting principles and in the form and manner prescribed by Franchisor from time to time in the Manuals or otherwise in writing. Franchisee shall preserve such books, records and accounts for not less than seven (7) years following the date of their preparation. Franchisor may require Franchisee to use an approved source for accounting and financial services in connection with the maintenance of the books and records.

B.        Franchisee, at its expense, shall submit to Franchisor a monthly report of Gross Sales of the Center and such other data or information as Franchisor may reasonably require. Such report shall be delivered each month during the term of this Agreement. Such report shall be due even if no Service Fee is due.

C.    In addition to the sales report described in Section 12.B., Franchisee, at its expense, shall submit to Franchisor a monthly and year-to-date financial statement of Franchisee and the business franchised hereunder. Such statement shall be prepared based on a calendar year and shall be prepared using the accrual method.  Such statement shall be delivered within thirty (30) days following the conclusion of each calendar month during the term of this Agreement and shall be prepared in accordance with generally accepted accounting principles and certified as true, complete and accurate by Franchisee or Franchisee's treasurer or chief financial officer.  In addition, upon the request of Franchisor, within sixty (60) days following the conclusion of Franchisee's fiscal year, Franchisee shall, at Franchisee's expense, deliver year-end financial statements of Franchisee and the Center that have been prepared in accordance with generally accepted accounting principles and reviewed for completeness and lack of material misstatements or omissions by an independent certified public accountant or bookkeeping service approved by Franchisor.

D.    Franchisee shall file all federal, state and local reports and returns, as may be required by law in connection with the operation of the Center.

E.    Franchisee shall also submit to Franchisor, for review or audit, such other forms, reports, tax returns, records, information and data as Franchisor may reasonably designate, in the form and at the times and places reasonably required by Franchisor, upon request and as specified from time to time in the Manuals or otherwise in writing.  Franchisee shall submit to Franchisor, a copy of Franchisee's federal tax return within sixty (60) days of the date of filing.

F.    Franchisor or its designated agents shall have the right at all reasonable times to examine, copy or electronically poll all of Franchisee's books, records, tax returns and correspondence. Franchisor shall also have the right at any time to have an independent audit performed on the books and records of Franchisee and the Center. If any such examination discloses a deficiency in any payment to Franchisor, Franchisor shall give notice of the deficiency to Franchisee, and Franchisee shall pay the amount of the deficiency within ten (10) days after receipt of the notice, together with interest from the date such amount was due until paid at the rate of eighteen percent (18%) per annum, or at the maximum rate of interest permitted by applicable law, whichever is less. If any inspection discloses an understatement of Gross Sales for any period of more than two percent (2%), Franchisee shall, in addition, reimburse Franchisor for all costs in connection with the examination or audit. The foregoing remedies shall be in addition to any other remedies Franchisor may have under this Agreement.

G.    Upon execution of this Agreement or at any time thereafter, Franchisee shall, at the option of Franchisor, execute such forms and documents as Franchisor deems necessary, including, but not limited to Attachment "G" to this Agreement to appoint Franchisor its true and lawful attorney-in-fact with full power and authority, for the sole purpose of obtaining any and all returns and reports filed by Franchisee with any state and/or federal taxing authority.  This power of attorney shall survive the expiration or termination of this Agreement.  Franchisee shall execute such additional documents as Franchisor shall require in connection with such appointment.

H.    Franchisee shall grant Franchisor or its agents, upon request of Franchisor, the right to contact and obtain information from third parties doing business with Franchisee regarding Franchisee's financial condition or business practices or policies.  Franchisee agrees that any third party, including, without limitation, clients, vendors, suppliers, financial institutions, lessors and financiers, may release any and all information requested by Franchisor without obtaining any further permission from Franchisee.

13.    Proprietary Marks

A.    Franchisor hereby grants to Franchisee a license to use the Proprietary Marks during the term of this Agreement in accordance with the System and the standards and specifications attendant thereto, as prescribed by Franchisor from time to time which underlie the goodwill associated with and symbolized by the Proprietary Marks.

FAREV3.03                                              -18-

B.      With respect to Franchisee's licensed use of the Proprietary Marks pursuant to this Agreement, Franchisee agrees that:

(1)      Franchisee shall use only the Proprietary Marks designated by Franchisor and shall use them only in the manner authorized and permitted by Franchisor. Any unauthorized use of the Proprietary Marks shall constitute an infringement of Franchisor's rights and a material event of default under this Agreement. Franchisee shall not use the name FASTSIGNS or any other Proprietary Mark in the corporate or other legal name of any corporation or other entity formed by or affiliated with Franchisee;

(2)      Franchisee shall use the Proprietary Marks only for the operation of the Center or in advertising for the Center. Franchisee shall permanently cease all use of the Proprietary Marks immediately upon termination or expiration of this Agreement and take appropriate action to remove the Proprietary Marks from the premises upon which the Center is located and to cancel any advertising relating to Franchisee's use of the Proprietary Marks, including Yellow Pages listings;

(3)      Franchisor shall have the right to approve any materials containing any of the Proprietary Marks, including, without limitation, signs, stationery, business cards, forms and other materials and supplies used by Franchisee;

(4)      During the term of this Agreement, Franchisee shall identify itself as the owner of the Center (i) in conjunction with any use of the Proprietary Marks, including without limitation, uses on invoices, order forms, receipts and contracts, and (ii) in a notice of such content and form and at such conspicuous locations at the Center premises as Franchisor may require;

(5)      Franchisee shall not use the Proprietary Marks to incur any obligation or indebtedness on behalf of Franchisor or any of its affiliates;

(6)      Unless otherwise authorized or required by Franchisor, Franchisee shall operate and advertise the Center only under the mark FASTSIGNS without prefix or suffix;

(7)      Franchisee shall comply with Franchisor's instructions in filing and maintaining the requisite trade name or fictitious name registrations, and shall execute any documents deemed necessary by Franchisor or its counsel to obtain protection for the Proprietary Marks or to maintain their continued validity and enforceability, and upon request of Franchisor, Franchisee shall provide it with a copy of such document(s); and

(8)      Franchisee and the Controlling Principals shall immediately notify Franchisor of any infringement of the Proprietary Marks or challenge to its use of any of the Proprietary Marks or claim by any person of any rights in any of the Proprietary Marks. Franchisee and the Controlling Principals agree that they will not communicate with any person other than Franchisor and Franchisor's counsel in connection with any such infringement, challenge, or claim. Franchisor shall have sole discretion to take such action as it deems appropriate and the right to exclusively control and conduct any litigation, or Patent and Trademark Office or other proceeding arising out of any infringement, challenge, or claim relating to any of the Proprietary Marks. Franchisee and each of the Controlling Principals agree to execute any and all instruments and documents, render such assistance, and perform such acts as may, in the opinion of Franchisor's counsel, be necessary or advisable to protect and maintain Franchisor's interests in any such litigation or Patent and Trademark Office or other proceeding or to otherwise protect and maintain Franchisor's interest in the Proprietary Marks.

C.      Franchisee and the Controlling Principals expressly acknowledge and agree that:

(1)      Franchisor is the owner of all right, title and interest in and to the Proprietary Marks and the goodwill associated with and symbolized by them;

(2)     The Proprietary Marks are valid and serve to identify Franchisor as the source of origin of goods and services provided under them;

(3)     Neither Franchisee nor any Controlling Principal shall directly or indirectly contest the ownership or validity of the Proprietary Marks;

(4)     Franchisee's use of the Proprietary Marks pursuant to this Agreement does not give Franchisee any ownership or other interest in or to the Proprietary Marks, except the limited license granted pursuant to this Agreement;

(5)     Any and all goodwill and improvements to the System arising from Franchisee's use of the Proprietary Marks shall inure solely and exclusively to the benefit of Franchisor, and upon expiration or termination of this Agreement and the license herein granted, no monetary amount shall be assigned as attributable to any goodwill associated with Franchisee's use of the System or the Proprietary Marks; and

(6)     Franchisor reserves the right to substitute different Proprietary Marks for use in identifying the System and the businesses operating thereunder if the Proprietary Marks no longer can be used or such use is restricted, or if Franchisor, in its sole business judgment, determines that substitution of different marks will be beneficial to the System.  Any costs incurred by Franchisee to comply with any change or modification of the Proprietary Marks shall be paid solely by Franchisee; provided that Franchisor shall reimburse Franchisee for reasonable expenses incurred which are directly related to such change or modification upon receipt of documentation satisfactory to Franchisor, such reimbursement to be limited to fifty percent (50%) of Franchisee's total expenses or two thousand dollars ($2,000.00), whichever is less.

14.     **Confidential Manuals**

A.     Franchisee shall receive on loan from Franchisor several manuals including, without limitation, the Site Selection Notebook, Romancing the Shopping Center Kit, Pre-Opening Manual, FASTSIGNS Operations Manual, Target Marketing Manual, Marketing Resource Manual, Customer Service Kit Audio/Video, Computer Manual, Typestyles & Symbols Manual, Employee Manual, Personnel Manual, Price List Manual, and any other materials designated by Franchisor from time to time (collectively, the "Manuals") concerning the operation, merchandise, equipment, supplies, sales, service, advertising, marketing and other aspects of the System.  The term Manuals also includes confidential information maintained electronically at support.fastsigns.com; since access to this electronic information is via password only, Franchisee must maintain its password in a secure place.  Franchisee and the Controlling Principals and all other employees shall at all times treat the Manuals, any other manuals created for or approved for use in operation of the Center, and the information contained therein as confidential and shall maintain such information as secret and confidential.  One set of the Manuals shall be loaned at no expense to Franchisee.  In the event Franchisee loses a Manual, Franchisee shall purchase a Replacement Manual.  Franchisor also reserves the right to impose a reasonable fee for the replacement of any Manual loaned to Franchisee.  Additional copies of the Manuals may be loaned to Franchisee by Franchisor at a reasonable cost.  Neither Franchisee nor any of the Controlling Principals shall at any time copy, duplicate, record or otherwise reproduce the foregoing materials in whole or in part, nor otherwise disclose or make the same available to an unauthorized person.

B.     In order to protect the reputation and goodwill of Franchisor and to maintain high standards of operation under Franchisor's Proprietary Marks, Franchisee shall conduct its business in accordance with the Manuals, other written directives which Franchisor may issue to Franchisee from time to time whether or not such directives are made part of the Manuals, and any other manuals and materials created or approved for use in the operation of the Center.

C.     Franchisee and each of the Controlling Principals acknowledge and agree that it will abide by the specifications, standards and procedures contained in each of the Manuals.

FAREV3.03                                    -20-

D.     The Manuals, written directives, other manuals and materials, and any other confidential communications provided or approved by Franchisor shall at all times remain the sole property of Franchisor, shall at all times be kept in a secure place on the Center premises and shall be returned to Franchisor immediately upon request or upon termination or expiration of this Agreement.

E.     Franchisor may from time to time revise the contents of the Manuals and the contents of any other manuals and materials created or approved for use in the operation of the Center. Franchisee expressly agrees to insert all changes and additions into the correct Manual upon receipt of the same and agrees to comply with each new or changed standard.

F.     Franchisee shall at all times ensure that the Manuals are kept current and up to date. In the event of any dispute as to the contents of the Manuals, the terms of the master copy of the Manuals maintained by Franchisor at Franchisor's corporate office shall be controlling.

15.   **Confidential Information**

A.     Franchisee and each of the Controlling Principals shall not, during the term of this Agreement or any time thereafter, communicate, divulge, or use for the benefit of any other person, partnership, association, corporation or other entity any confidential information, trade secrets, knowledge, know-how, or techniques concerning the methods of operation of the Center which, in addition to the Manuals described above, may be communicated or provided to Franchisee or Controlling Principals or of which they may be apprised by virtue of Franchisee's operation of the Center under the terms of this Agreement. Franchisee and Controlling Principals shall divulge such confidential information only to the General Manager and such of Franchisee's employees as must have access to such confidential information in connection with the operation of the Center. Any and all information, trade secrets, knowledge, know-how, techniques and any materials used in or related to the System which Franchisor provides to Franchisee in connection with this Agreement which Franchisor designates as confidential shall be deemed confidential for purposes of this Agreement. Neither Franchisee nor any of the Controlling Principals shall, at any time, copy, duplicate, record or otherwise reproduce such materials or information, in whole or in part, or otherwise make the same available to any unauthorized person, without the prior written consent of Franchisor.

B.     Franchisee shall require and obtain execution of covenants similar to those set forth in Sections 14. and 15.A. from its General Manager and all other personnel of Franchisee who have received or will have access to confidential information. Such covenants shall be substantially in the form set forth in **Attachment "D"**. All of Franchisee's Principals also must execute such covenants. Franchisor may, in its sole discretion, modify Attachment "D" with respect to any Center personnel to remove the covenant-not-to-compete provisions if, pursuant to Section 19., Franchisor does not require execution of such covenants by Franchisee's personnel.

C.     If Franchisee or any of the Controlling Principals develops any new concepts, processes, or improvements in the operation or promotion of the Center, Franchisee agrees to promptly notify Franchisor and provide Franchisor with all necessary information concerning the same, without compensation. Franchisee and Franchisee's Principals acknowledge that any such concept, process or improvement shall become the property of Franchisor, and Franchisor may utilize or disclose such information to its developers, franchisees and other parties as it deems appropriate.

D.     Franchisee and each of the Controlling Principals acknowledge that any failure to comply with the requirements of this Section 15. shall constitute a material event of default under this Agreement; that such failure will cause Franchisor irreparable injury and that money damages will not adequately compensate Franchisor; and that Franchisor may obtain specific performance of, or an injunction against a violation of, the requirements of this Section 15. without the necessity of posting bond. Franchisee and the Controlling Principals agree to pay all court costs and reasonable attorneys' fees incurred by Franchisor in enforcing its rights under this Section 15.

16.     Default and Termination

A.      Franchisee shall be deemed to be in default under this Agreement, and all rights granted herein shall automatically terminate without notice to Franchisee if Franchisee shall become insolvent or shall have made a general assignment for the benefit of creditors; or a petition under any section or chapter of federal bankruptcy laws or under any similar law or statute of the United States or any state thereof shall have been filed by Franchisee or such a petition shall have been filed against and not opposed by Franchisee; or Franchisee admits in writing its inability to pay its debts when due; or Franchisee shall have been adjudicated bankrupt or insolvent in proceedings filed against Franchisee under any section or chapter of federal bankruptcy law or any similar law or statute of the United States or any state thereof; or a bill in equity or other proceeding for the appointment of a receiver of Franchisee or other custodian for Franchisee's business or assets shall have been filed and not opposed by Franchisee; or a receiver or other custodian (permanent or temporary) of Franchisee's assets or property, or any part thereof, shall have been appointed by any court of competent jurisdiction; or proceedings for a composition with creditors under any state or federal law shall have been instituted by or against Franchisee; or a final judgment against Franchisee shall have remained unsatisfied or of record for thirty (30) days or longer (unless supersedeas bond shall have been filed); or if Franchisee is dissolved; or execution shall have been levied against Franchisee, Franchisee's Center or property; or suit to foreclose any lien or mortgage against the premises or equipment shall have been instituted against the premises or equipment of any business operated hereunder and not dismissed within thirty (30) days; or the real or personal property of any business operated hereunder shall be sold after levy thereupon by any sheriff, marshal or constable; or if Franchisee's or Franchisee's Controlling Principal's business, assets, property or interests are "blocked" under any law, ordinance or regulation relating to terrorist activities or if Franchisee or Franchisee's Controlling Principals are otherwise in violation of any such law, ordinance or regulation.

B.      Franchisee shall be in default and Franchisor may, in its sole discretion, immediately terminate this Agreement and all rights granted hereunder, without affording Franchisee any opportunity to cure the default (except as otherwise required by law) effective upon notice to Franchisee, upon the occurrence of any of the following events, each of which shall be deemed to be a material event of default:

(1)      If Franchisee operates the Center or sells any products or services authorized by Franchisor for sale at the Center, which has not been approved by Franchisor;

(2)      If Franchisee fails to acquire a site for the Center within sixty (60) days following the date of this Agreement, or if after the acquisition of an approved site, Franchisee is unable to obtain the required permits, licenses, and certifications required to commence construction within sixty (60) days after the location is approved or if Franchisee fails to acquire sufficient financing to complete construction of the Center and to open the Center for business within one hundred twenty (120) day following the date of this Agreement (unless any extension of such time periods is approved by Franchisor in writing); provided, however, under such circumstances, Franchisor shall, subject to Franchisee's compliance with the post-termination obligations under Section 17., refund the initial franchise fee actually paid by Franchisee pursuant to Section 3.A., without interest, less Four Thousand Dollars ($4,000.00) of such franchise fee. This refund is only applicable when Franchisee pays the full Twenty Thousand Dollar ($20,000.00) franchise fee. Such payment shall be made within thirty (30) days after the effective date of the termination. Franchisor shall not be obligated to return any fees paid by Franchisee in the event this Agreement is terminated by Franchisor pursuant to any other term of this Agreement or by Franchisee for any reason other than the reasons expressly set forth above;

(3)      Franchisee knowingly shall have made a false representation to Franchisor in any of the reports or statements which Franchisee may be required to furnish to Franchisor pursuant to this Agreement or pursuant to the Manuals;

(4)     Franchisee or any of the Controlling Principals shall have been convicted of or shall have entered a plea of nolo contendere to a felony, a crime involving moral turpitude, or any other crime or offense that Franchisor shall believe reasonably likely to have an adverse effect on the System, the Proprietary Marks, the goodwill associated therewith or Franchisor's interest therein;

(5)     If Franchisee shall have ceased to do business at the Center for five (5) business days, or shall have lost the right to possession of the premises, or otherwise shall have forfeited the right to do or transact business in the jurisdiction where the Center is located; provided, however, this provision shall not apply in cases of Force Majeure (as defined in Section 28.A.) if, through no fault of Franchisee, the premises shall have been damaged or destroyed and Franchisee, within thirty (30) days after such damage or destruction has occurred, applies for Franchisor's approval to relocate or reconstruct the Center premises, which approval shall not be unreasonably withheld, but may be conditioned upon the payment of an agreed minimum Service Fee to Franchisor during the period in which the Center is not in operation;

(6)     If Franchisee fails to designate a qualified replacement General Manager thereto within thirty (30) days after such General Manager ceases to serve as such, as provided in Section 9.B. above;

(7)     If Franchisee breaches or is in default under any of the representations, warranties and covenants contained in Section 5.;

(8)     If a transfer or attempt to transfer any rights or obligations under this Agreement or any interest in Franchisee or the Center to any third party is made by Franchisee or the Controlling Principals without Franchisor's prior written consent, or without offering Franchisor a right of first refusal with respect to such transfer, contrary to the terms of Section 18. of this Agreement;

(9)     If Franchisee or any of the Controlling Principals fails to comply with the covenants in Section 15.A. or 19.B. hereof or if Franchisee fails to obtain the execution of the covenants required under Section 15.B. or 19.I. hereof within thirty (30) days following Franchisor's request that Franchisee obtain the execution of such covenants;

(10)    If an approved transfer upon death or permanent disability is not effected within the time period prescribed by Section 18.E. hereof;

(11)    If Franchisee fails to open and operate the Center within one hundred twenty (120) days after the date of execution of this Agreement, or within any additional time period approved by Franchisor pursuant to Section 6.G. of this Agreement;

(12)    If Franchisee misuses or makes any unauthorized use of the Proprietary Marks or otherwise materially impairs the goodwill associated therewith or with the System, or Franchisor's rights therein and does not cure such default within twenty-four (24) hours following notice thereof from Franchisor;

(13)    If Franchisee fails to procure and maintain such insurance policies as required by Section 10. and Franchisee fails to cure such default within seven (7) days following notice thereof from Franchisor;

(14)    If Franchisee or any Controlling Principal fails, refuses, or neglects to promptly pay any monetary obligation owing to Franchisor or its subsidiaries or affiliates when due, or to submit the financial or other information required by Franchisor under this Agreement, and does not cure such default within ten (10) days following notice thereof from Franchisor;

(15)    If Franchisee is in default with respect to the payment of any monetary obligation due to Franchisor hereunder more than two (2) times during any immediately preceding twelve (12) month period of time, whether or not cured by Franchisee after notice by Franchisor; or

(16)     Except as provided in Section 16.B.(15), if Franchisee or and Contr repeatedly is in default under Section 16.C. hereof for failure to comply with any of th imposed by this Agreement, whether or not such defaults are of the same or different nat or not such defaults have been cured by Franchisee after notice by Franchisor.

(17)     Any default by Franchisee under the terms and conditio agreement between Franchisor and Franchisee, or a default by Franchisee of his obligations to any Advertising Cooperative of which Franchisee is a member, shall be deemed to be a default of this Agreement.  Furthermore, in the event of termination, for any cause, of any other agreement between the parties hereto, Franchisor may, at its option, terminate this Agreement.

(18)     If Franchisee fails to attend an annual franchisee convention once within every three (3) year period as provided in Section 8.C. of this Agreement.

C.     Except as provided in Section 16.B. above, upon any default by Franchisee which is susceptible of being cured, Franchisor may terminate this Agreement only by giving written notice of termination stating the nature of such default to Franchisee at least thirty (30) days prior to the effective date of termination; provided, however, that Franchisee may avoid termination by immediately initiating a remedy to cure such default and curing it to Franchisor's satisfaction within the thirty (30) day period, and by promptly providing proof thereof to Franchisor. If any such default is not cured within the specified time, or such longer period as applicable law may require, this Agreement shall terminate without further notice to Franchisee effective immediately upon the expiration of the thirty (30) day period or such longer period as applicable law may require.  Defaults which are susceptible of cure hereunder may include, but are not limited to, the following illustrative events:

(1)     If Franchisee fails to comply with any of the requirements imposed by this Agreement, as it may from time to time be amended or reasonably be supplemented by the Manuals, or fails to carry out the terms of this Agreement in good faith;

(2)     If Franchisee fails to maintain or observe any of the standards or procedures prescribed by Franchisor in this Agreement, the Manuals, or otherwise in writing;

(3)     If Franchisee fails, refuses or neglects to obtain Franchisor's prior written approval or consent as required by this Agreement;

(4)     If Franchisee or any Controlling Principal engages in any business or markets any service or product under a name or mark which, in Franchisor's opinion, is confusingly similar to the Proprietary Marks; or

(5)     If Franchisee receives three (3) or more material customer complaints within a twelve (12) month period that are reported to Franchisor and are not resolved to Franchisor's complete satisfaction.

17.     <u>Obligations Upon Termination or Expiration</u>

Upon termination or expiration of this Agreement, all rights granted hereunder to Franchisee shall forthwith terminate, and each of the following provisions shall apply:

A.     Franchisee shall immediately and permanently cease to use in any manner whatsoever any equipment, methods, procedures and techniques associated with the System, the name FASTSIGNS and all Proprietary Marks and distinctive trade dress and devices associated with the System, and Franchisee shall not thereafter, directly or indirectly, represent to the public or hold itself out as a present or former franchisee of Franchisor.

FAREV3.03                                          -24-

B.     Franchisee shall take such action as may be necessary to cancel any assumed name or equivalent registration which contains the mark FASTSIGNS or any other trademark or service mark of Franchisor, and Franchisee shall furnish Franchisor with evidence satisfactory to Franchisor of compliance with this obligation within five (5) days after termination or expiration of this Agreement.

C.     Franchisee and the Controlling Principals shall promptly pay all sums owing to Franchisor and its subsidiaries and affiliates.  Such sums shall include all damages, costs and expenses, including reasonable attorneys' fees, incurred by Franchisor as a result of the termination or expiration of this Agreement (including damages, expenses and attorneys' fees incurred in obtaining injunctive or other relief for the enforcement of any provision of this Section 17.), which obligation shall, until paid in full, give rise to and remain a lien in favor of Franchisor against any and all of the personal property, furnishings, fixtures, equipment, signs and inventory owned by Franchisee and on the premises at the time of the termination or expiration.  Franchisor shall have the right to file this Agreement as a financing statement with the proper offices to perfect its lien hereunder.

D.     Franchisee shall immediately deliver to Franchisor all manuals, including the Manuals, records, files (including electronic files), customer lists, point-of-sale databases, instructions, correspondence, and any and all other materials relating to the System and the operation of the business franchised hereunder in Franchisee's possession, and all copies thereof (all of which are acknowledged to . be Franchisor's property), and Franchisee shall retain no copy or record of any of the foregoing, except Franchisee's copy of this Agreement and any correspondence between the parties, and any other documents which Franchisee reasonably needs for compliance with any provision of law.

E.     Franchisee, at Franchisor's option, shall assign to Franchisor all rights to the telephone number for the Center and any related Yellow Pages or other business listings and execute all forms and documents required by Franchisor and any telephone company at any time to transfer such service and numbers to Franchisor.  Notwithstanding any forms and documents which may have been executed by Franchisee under Section 4.C., Franchisee hereby appoints Franchisor its true and lawful agent and attorney-in-fact with full power and authority, for the sole purpose of taking such action as is necessary to complete such assignment.  Franchisee shall thereafter use different telephone numbers at or in connection with any subsequent business conducted by Franchisee.

F.     Franchisee shall, at Franchisor's option, assign to Franchisor any interest, which Franchisee has in any lease or sublease for the premises or with respect to any equipment used in the operation of the Center. Franchisor may exercise such option at or within thirty (30) days after either termination or (subject to any existing right to renew) expiration of this Agreement.  In the event Franchisor does not elect to exercise its option to acquire the lease or sublease for the premises of the Center, Franchisee shall make such modifications or alterations to the premises operated hereunder immediately upon termination or expiration of this Agreement as may be necessary to distinguish the appearance of such premises from that of other FASTSIGNS centers under the System, and shall make such specific additional changes thereto as Franchisor may reasonably request for that purpose.  In the event Franchisee fails or refuses to comply with the requirements of this Section 17., Franchisor shall have the right to enter upon the premises where Franchisee's Center was operated, without being guilty of trespass or any other tort, for the purpose of making or causing to be made such changes as may be required, at the expense of Franchisee, which expense Franchisee agrees to pay upon demand.

G.     Franchisor shall also have the option, but not the obligation, which it may exercise by providing written notice thereof within thirty (30) days after termination or expiration of this Agreement, to purchase any or all inventory, fixtures, equipment, furnishings and any and all other items bearing the Proprietary Marks, at Franchisee's cost or fair market value, whichever is less. If the parties cannot agree on fair market value within thirty (30) days, Franchisor and Franchisee shall each select one (1) qualified independent appraiser, the two (2) appraisers, together, will select the third appraiser. No value will be given to goodwill for the Center.  The value as determined by the appraisers shall be binding on both Franchisor and Franchisee.  Franchisor and Franchisee will each pay one-half of the cost of the appraisal. In the event Franchisor exercises this option, Franchisee shall deliver to Franchisor, in a form satisfactory to Franchisor, such bills of sale, assignments, releases of liens and other such documents, which

FAREV3.03                                                    -25-

Franchisor deems reasonably necessary. The closing for such purchase shall be within thirty (30) days following the date the purchase price for such goods and items is determined, or such other date as the parties may mutually agree upon.

H.     Franchisee and each of the Controlling Principals agree, in the event any such party continues to operate or subsequently begins to operate any other business, not to use any reproduction, counterfeit, copy, or colorable imitation of the Proprietary Marks, either in connection with such other business or the promotion thereof, which is likely to cause confusion, mistake, or deception, or which is likely to dilute Franchisor's rights in and to the Proprietary Marks, and further agree not to utilize any designation of origin or description or representation which falsely suggests or represents an association or connection with Franchisor constituting unfair competition.

I.     Franchisee and the Controlling Principals shall comply with the restrictions on confidential information contained in Sections 14. and 15.A. and the covenants contained in Section 19.B. of this Agreement. Any other person required to execute similar covenants pursuant to Section 15.B. or 19.I. shall also comply with such covenants.

18.     Transfer of Interest

    A.     Transfer by Franchisor

        Franchisor shall have the right to transfer or assign this Agreement and all or any part of its rights or obligations hereunder to any person or legal entity and all rights hereunder shall inure to the benefit of Franchisor and its successors and assigns.

    B.     Transfer by Franchisee

        (1)     Franchisee and Controlling Principals acknowledge and agree that the rights and duties set forth in this Agreement are personal to Franchisee, and that Franchisor has granted the franchise rights hereunder in reliance on the business skill, financial capacity and personal character of Franchisee and the Controlling Principals. Accordingly, neither Franchisee nor any initial or subsequent successor or assign to any part of Franchisee's interest in this Agreement or the Center, nor any individual, partnership, corporation, or other entity which directly or indirectly has or owns any interest in this Agreement, the Center or Franchisee shall sell, assign, transfer, convey, pledge, mortgage, or otherwise encumber any direct or indirect interest in this Agreement, the Center or Franchisee without the prior written consent of Franchisor; provided, however, that Franchisor's prior written consent shall not be required for a transfer of less than a one percent (1%) interest in any entity that is required to register its securities under Section 12. of the Securities Exchange Act of 1934, as amended. Any purported assignment or transfer, by operation of law or otherwise, not having the written consent of Franchisor required by this Section 18., shall be null and void and shall constitute a material event of default under Section 16.B.(8) of this Agreement.

        (2)     Franchisor shall not unreasonably withhold its consent to a transfer of any interest in Franchisee, the Center or this Agreement; however, Franchisor may, in its sole discretion, require any or all of the following as conditions of its approval:

            (a)     All of Franchisee's accrued monetary obligations and all other outstanding obligations to Franchisor and its subsidiaries and affiliates shall have been satisfied in a timely manner;

            (b)     Franchisee or the Controlling Principals shall not be in default under any provision of this Agreement, any amendment or supplement hereto, or any other agreement between Franchisee or any of the Controlling Principals and Franchisor or any of its subsidiaries and affiliates;

            (c)     The transferor and its principals (if applicable) shall have executed a general release, in a form prescribed by Franchisor, of any and all claims of the transferor, of whatever

FAREV3.03                                              -26-

kind or nature, against Franchisor, its subsidiaries, affiliates, successors and assigns and their respective officers, directors, shareholders, partners, employees, agents and representatives, including, without limitation, claims arising under this Agreement or any other agreement between Franchisee and Franchisor or its subsidiaries or affiliates and federal, state and local laws, regulations, rules or orders;

(d)     The transferee and its principals shall have demonstrated to Franchisor's satisfaction the following:  transferee's meeting the criteria considered by Franchisor when reviewing a prospective franchisee's application for a franchise, including Franchisor's educational, managerial and business standards; transferee's character, business reputation, credit rating and financial capability; transferee's aptitude and ability to conduct the business contemplated hereunder (as may be evidenced by prior related business experience or otherwise); and transferee's completion of Franchisor's Confidential Questionnaire;

(e)     The transferee shall have entered into a written agreement, in a form prescribed by Franchisor, assuming full, unconditional, joint and several liability for, and agreeing to perform from the date of the transfer, all obligations, covenants and agreements contained in this Agreement, and, if transferee is a corporation or a partnership, transferee's shareholders, partners or other investors, as applicable, shall also execute such agreement as transferee's principals;

(f)     At Franchisor's option, the transferee shall have executed for a term ending on the expiration date of this Agreement and with such renewal term as may be provided herein, the standard form franchise agreement then being offered to new System franchisees or a revised form of this Agreement, as Franchisor deems appropriate, and all other ancillary documents as Franchisor may require, which agreements shall supersede this Agreement and its ancillary documents in all respects and the terms of which agreements may differ from the terms of this Agreement and may include, without limitation, higher service fees and advertising fees, and a revised Territory; provided, however, that the transferee shall not be required to pay any initial franchise fee; and if the transferee is a corporation, a limited liability company, or partnership, transferee's shareholders, partners or other investors, as applicable, shall also execute such agreements as transferee's principals, and guarantee the performance of all such obligations, covenants and agreements. Any franchise agreement signed by the transferee shall contain substantially the terms and provisions set forth in Attachment "I" to this Agreement, except as Franchisor may otherwise consent to in writing;

(g)     Transferor shall have executed any documents reasonably required by Franchisor to evidence transferor's obligation to remain liable, except for those obligations surviving any termination of transferor's interest in Franchisee, the Center or this Agreement, for all of the obligations to Franchisor prior to the effective date of the transfer;

(h)     Transferee (or, if transferee is a corporation, limited liability company or a partnership, one of transferee's shareholders, partners or investors, as designated by Franchisor) and transferee's manager shall have completed any training programs then in effect for System franchisees upon such terms and conditions as Franchisor may reasonably require;

(i)     If transferee is a corporation, limited liability company or a partnership, transferee shall make and will be bound by any or all of the representations, warranties, and covenants set forth in Section 5. as Franchisor requests. Transferee shall provide to Franchisor evidence satisfactory to Franchisor that the terms of Section 5. have been satisfied and are true and correct on the date of transfer;

(j)     Transferee, at its expense, shall renovate and modernize the facilities and equipment used in the Center to Franchisor's then-current standards for Centers under the System, as Franchisor may require; and

(k)     If transferor proposes to transfer an interest in any Agreement, the Center or in Franchisee, as applicable, transferor must pay to Franchisor a transfer fee equal to a pro rata portion of ten thousand dollars ($10,000.00), with a minimum fee of three hundred dollars ($300.00), based upon the percentage of interest that is being transferred (e.g., if Franchisee wishes to transfer fifty-five

FAREV3.03                                            -27-

percent (55%) of an interest or shares of Franchisee, transferor shall pay a transfer fee equal to fifty-five percent (55%) of ten thousand dollars ($10,000.00) or five thousand five hundred dollars ($5,500.00)). If the proposed transfer is to or among Franchisee's Principals, or to or among the immediate family members of Franchisee or any of its Principals (defined as the spouse of transferor and transferor's children (including half-blood or adopted children)), transferor shall pay a transfer fee of three hundred dollars ($300.00), or such greater amount as is necessary to compensate Franchisor for its costs in reviewing such transfer (including attorneys' fees). In the event there is a transfer of interest or transfer of shares of Franchisee among Franchisee's Principals that were not an original party to the Agreement, transferor shall pay a transfer fee equal to a pro rata portion of ten thousand dollars ($10,000) less any transfer fee previously paid by Transferor. The fees referenced herein are to reimburse Franchisor for its reasonable costs and expenses associated with reviewing the transfer and training costs for the transferee.

(3)     Franchisee shall not grant a security interest in this Agreement or the rights hereunder without Franchisor's prior written consent, which consent shall not be unreasonably withheld. In connection therewith, the secured party shall be required by Franchisor to agree that in the event of any default by Franchisee under any documents related to the security interest, Franchisor shall have the right and option (but not the obligation) to be substituted as obligor to the secured party and to cure any default of Franchisee.

(4)     Franchisee and Franchisee's Principals acknowledge and agree that each condition which must be met by the transferee is reasonable and necessary to assure such transferee's full performance of the obligations hereunder.

C.     Transfer for Convenience of Ownership

In the event that the proposed transfer is to a corporation, a proprietorship, a partnership or limited liability company formed by Franchisee solely for the convenience of ownership, Franchisor's consent to such transfer shall be conditioned upon the requirements set forth in this Section 18. except for the requirements of Sections 18.B.(2)(c), (d), (f) and (h); and provided that Franchisee shall pay a transfer fee of three hundred dollars ($300.00), or such greater amount as is reasonably necessary to reimburse Franchisor for its expenses in connection with the approval of the transfer and shall deliver to Franchisor the documents described in Section 5.A. above with respect to such corporation. Notwithstanding the foregoing, if such transfer by Franchisee is prior to commencement of the initial training program described in Section 8.A. above, there shall be no transfer fee provided that Franchisee otherwise complies with the provisions of this Section 18.C. Franchisee shall be the owner of all the voting stock or interest of the corporation and if Franchisee is more than one individual, each individual shall have the same proportionate ownership interest in the corporation as he had in Franchisee prior to the transfer.

D.     Right of First Refusal

(1)     Any party holding a twenty-five percent (25%) or more interest in Franchisee, the Center or this Agreement, or a controlling interest if less than twenty-five percent (25%), who desires to accept any bona fide offer from a third party to purchase such interest shall promptly notify Franchisor in writing of each such offer and shall provide such information and documentation relating to the offer as Franchisor may require including, without limitation, the name and address of the prospective purchaser, the terms of the offer and a copy of any letter of intent or proposed purchase contract. Franchisor shall have the right and option, exercisable for thirty (30) days after receipt of such written notification, to send written notice to the seller that Franchisor intends to purchase the seller's interest on the same terms and conditions offered by the third party. In the event Franchisor elects to purchase the seller's interest, closing on such purchase must occur within sixty (60) days from the date of notice to the seller of the election to purchase by Franchisor or such later date as may be provided in the third party offer. Any material change in the terms of any offer prior to closing shall constitute a new offer subject to the same rights of first refusal by Franchisor as in the case of an initial offer. Failure of Franchisor to exercise the option afforded by this Section 18.D. shall not constitute a waiver of any other provision of this Agreement, including all of the requirements of this Section 18., with respect to a proposed transfer.

(2)    In the event an offer from a third party provides for payment of consideration other than cash or involves certain intangible benefits, Franchisor may elect to purchase the interest proposed to be sold for the reasonable equivalent in cash. If the parties cannot agree within a reasonable time on the reasonable equivalent in cash of the non-cash offer, Franchisor and Franchisee shall each select one qualified independent appraiser. The two (2) appraisers together will select the third appraiser. The value as determined by the appraisers shall be binding on both Franchisor and Franchisee.  Franchisor shall have the right to set off the cost of such appraisal against the purchase price.

E.    <u>Transfer Upon Death or Permanent Disability</u>

(1)    Upon the death of Franchisee, if Franchisee is an individual, Franchisee's General Manager, if the General Manager owns or holds any interest in Franchisee, the Center or this Agreement, or any of the Controlling Principals or other persons with a twenty-five percent (25%) or more interest in Franchisee, the Center or this Agreement, or a controlling interest if less than twenty-five percent (25%) (the "Deceased"), the executor, administrator or other personal representative of the Deceased shall have six (6) months from the date of death to transfer such interest to a third party approved by Franchisor. If no personal representative is designated or appointed or no probate proceedings are instituted with respect to the estate of the Deceased, then the distributee of such interest must be approved by Franchisor. If the distributee is not approved by Franchisor, then the distributee shall transfer such interest to a third party approved by Franchisor within six (6) months after the death of the Deceased.

(2)    Upon the permanent disability of Franchisee, if Franchisee is an individual, Franchisee's General Manager, if the General Manager owns or holds any interest in Franchisee, the Center or this Agreement, or any Controlling Principal or other person with a twenty-five percent (25%) or more interest in Franchisee, the Center or this Agreement, or a controlling interest if less than twenty-five percent (25%), Franchisor may, in its sole discretion, require such interest to be transferred to a third party approved by Franchisor within six (6) months after notice to Franchisee. "Permanent disability" shall mean any physical, emotional, or mental injury, illness, or incapacity which would prevent a person from performing the obligations set forth in this Agreement for at least ninety (90) consecutive days and from which condition recovery within ninety (90) days from the date of determination of disability is unlikely. Permanent disability shall be determined upon examination of the person by a licensed practicing physician selected by Franchisor; or if the person refuses to submit to an examination, then such person shall be automatically deemed permanently disabled as of the date of such refusal for the purpose of this Section 18. The costs of any examination required by this Section 18.E.(2) shall be paid by Franchisor.

(3)    Upon the death or claim of permanent disability of any person described in Sections 18.E.(1) and 18.E.(2), Franchisee or a representative of Franchisee must promptly notify Franchisor of such death or claim of permanent disability.  Any transfer upon death or permanent disability shall be subject to the same terms and conditions as described in Section 18. for any <u>inter vivos</u> transfer.  If an interest is not transferred upon death or permanent disability as required in this Section 18.E., and in accordance with the terms and conditions of Section 18, such failure shall constitute a material event of default under Section 16.B.(10).

F.    <u>Non-Waiver of Claims</u>

Franchisor's consent to a transfer of any interest in Franchisee or this Agreement shall not constitute a waiver of any claims it may have against the transferring party, nor shall it be deemed a waiver of Franchisor's right to demand exact compliance with any of the terms of this Agreement by the transferee.

G.    <u>Offerings by Franchisee</u>

Securities or partnership interests in Franchisee may be offered to the public, by private offering or otherwise after the date hereof only with the prior written consent of Franchisor, which consent shall not be unreasonably withheld.  All materials required for such offering by federal or state

FAREV3.03                                    -29-

law shall be submitted to Franchisor for a limited review as described below prior to their being filed with any government agency, and any materials to be used in any exempt offering shall be submitted to Franchisor for such review prior to their use. No Franchisee offering shall imply (by use of the Proprietary Marks or otherwise) that Franchisor or any of its subsidiaries or affiliates is participating in an underwriting, issuance or offering of Franchisor's or Franchisee's or their subsidiaries, or affiliates' securities, and Franchisor's review of any offering shall be limited solely to the subject of the relationship among Franchisee, Franchisor and any subsidiaries or affiliates, if applicable. Franchisor may, at its option, require Franchisee's offering materials to contain a written statement prescribed by Franchisor concerning the limitation described in the preceding sentence. Franchisee, Controlling Principals and any other participants in the offering shall fully indemnify Franchisor, its subsidiaries, affiliates, successors and assigns and their respective directors, officers, shareholders, partners, employees, agents and representatives in connection with the offering. For each proposed offering, Franchisee shall pay to Franchisor a non-refundable fee of two thousand five hundred dollars ($2,500.00) or such greater amount as is necessary to reimburse Franchisor for its reasonable costs and expenses associated with reviewing the proposed offering, including, without limitation, legal and accounting fees. Franchisee shall give Franchisor written notice at least thirty (30) days prior to the date of commencement of any offering or other transaction covered by this Section 18.G.

19. **Covenants**

      A.      Franchisee and the Controlling Principals specifically acknowledge that, pursuant to this Agreement, Franchisee and the Controlling Principals will receive valuable specialized training, trade secrets, and confidential information, including, without limitation, information regarding the management, operational and marketing methods and techniques of Franchisor and the System which are beyond the present skills and experience of Franchisee and the Controlling Principals and Franchisee's managers and employees. Franchisee and Controlling Principals acknowledge that such specialized training, trade secrets, and confidential information provide a competitive advantage and will be valuable to them in the operation of the Center, and that gaining access to such specialized training, trade secrets, and confidential information is, therefore, a primary reason why they are entering into this Agreement.

      B.      In consideration for such specialized training, trade secrets, confidential information and exclusive rights described in Section 19.A. above, Franchisee and the Controlling Principals covenant as follows:

      (1)      With respect to Franchisee, during the term of this Agreement, or with respect to each of the Controlling Principals, during the term of this Agreement for so long as such individual or entity satisfies the definition of "Controlling Principal" (as described in Section 27.E.), except as otherwise approved in writing by Franchisor, neither Franchisee nor any of the Controlling Principals shall, either directly or indirectly, for themselves or through, on behalf of or in conjunction with any person(s), partnership, corporation or limited liability company:

      (a)      divert or attempt to divert any business or customer of the Center to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with Franchisor's Proprietary Marks and the System;

      (b)      except as permitted by Section 9.D., employ or seek to employ any person who is at that time employed by Franchisor or by any other franchisee of Franchisor, or otherwise directly or indirectly induce such person to leave his or her employment; or

(c)    own, maintain, operate, engage in, or have any interest in any business which is the same as or similar to the Center including, but not limited to, any business located within the United States, its territories or commonwealths, or any other country, province, state or geographic area in which Franchisor has used, sought registration of or registered the same or similar Proprietary Marks or operates or licenses others to operate a business under the same or similar Proprietary Marks, that produces and offers for sale graphics, banners, signs, ready-to-apply lettering, exhibits and displays and digital imaging.

(2)    With respect to Franchisee, and for a continuous uninterrupted period commencing upon the expiration or termination (regardless of the cause of termination) or transfer of this Agreement (or, with respect to each of the Controlling Principals, for a continuous uninterrupted period commencing upon the earlier of: (i) the expiration or termination of or transfer of all of Franchisee's interest in this Agreement or (ii) the time such individual or entity ceases to satisfy the definition of "Controlling Principal") and for two (2) years thereafter, except as otherwise approved in writing by Franchisor, neither Franchisee nor any of the Controlling Principals shall, either directly or indirectly, for themselves, or through, on behalf of, or in conjunction with any person, persons, partnership, corporation or limited liability company:

(a)    divert or attempt to divert any business or customer of the Center to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with Franchisor's Proprietary Marks and the System;

(b)    except as permitted by Section 9.D., employ or seek to employ any person who is at that time employed by Franchisor or by any other franchisee of Franchisor, or otherwise directly or indirectly induce such person to leave his or her employment; or

(c)    own, maintain, operate, engage in, or have any interest in any business which is the same as or similar to the Center including, but not limited to, any business that produces and offers for sale graphics, banners, signs, ready-to-apply lettering, exhibits and displays and digital imaging which business is, or is intended to be, located within the Territory, or within a ten (10) mile radius of any Center or sign making facility that is owned or operated by Franchisor or its affiliates, or any franchisee of Franchisor, in existence or under construction at any given time during such period; and

C.    The parties acknowledge and agree that each of the covenants contained herein are reasonable limitations as to time, geographical area, and scope of activity to be restrained and do not impose a greater restraint than is necessary to protect the goodwill or other business interests of Franchisor. The parties agree that each of the covenants herein shall be construed as independent of any other covenant or provision of this Agreement. It is the express intention of the parties to this Agreement to comply with all laws applicable to the covenants contained in this Agreement. If any of the covenants contained in this Section 19. are found to exceed in duration, geographical area or scope those permitted by applicable law, it is expressly agreed that such restrictive covenant may be reformed or modified by the final judgment of a court of competent jurisdiction or other lawful constituted authority to reflect a lawful and enforceable duration, geographical area or scope, and such covenant automatically shall be deemed to be amended and modified so as to comply with the judgment or order of such court or authority. If any one or more of the provisions contained in this Section 19. shall for any reason be held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not effect any other provisions of this Agreement, and the Agreement shall be construed as if such invalid, illegal or unenforceable provisions had never been contained herein.

D.    Franchisee and the Controlling Principals understand and acknowledge that Franchisor shall have the right, in its sole discretion, to reduce the scope of any covenant set forth in Section 19.B. in this Agreement, or any portion thereof, without their consent, effective immediately upon notice to Franchisee; and Franchisee and Controlling Principals agree that they shall comply forthwith with any covenant as so modified, which shall be fully enforceable notwithstanding the provisions of Section 21 hereof.

FAREV3.03                                                   -31-

E.     Franchisee and Controlling Principals expressly agree that the existence of any claims they may have against Franchisor, whether or not arising from this Agreement, shall not constitute a defense to the enforcement by Franchisor of the covenants in this Section 19.

F.     Franchisee and Controlling Principals understand and agree that the restrictions contained in Section 19.B. are reasonable and necessarily protect the legitimate interests of Franchisor.

G.     Franchisee and each of Controlling Principals acknowledge that any failure to comply with the requirements of this Section 19. shall constitute a material event of default under this Agreement; that such failure will cause Franchisor irreparable injury and that money damages will not adequately compensate Franchisor; and that Franchisor may obtain specific performance of, or an injunction against a violation of, the requirements of this Section 19. without the necessity of posting bond. Franchisee and Controlling Principals agree to pay all court costs and reasonable attorneys' fees incurred by Franchisor in enforcing its rights under this Section 19.

H.     Franchisee shall require and obtain execution of covenants similar to those set forth in this Section 19. (including covenants applicable upon the termination of a person's relationship with Franchisee) from Franchisee's General Manager and any other personnel employed by Franchisee who have received or will receive training from Franchisor and all of Franchisee's Principals that are not designated as Controlling Principals. Such covenants shall be substantially in the form set forth in Attachment "D". Failure by Franchisee to obtain execution of a covenant required by this Section 19.I. shall constitute a material event of default under Section 16.B.(8) hereof.

20.    **Independent Contractor and Indemnification**

A.     It is understood and agreed by the parties hereto that this Agreement does not create a fiduciary relationship between them; that Franchisee shall be an independent contractor; and, that nothing in this Agreement is intended to constitute either party an agent, legal representative, subsidiary, affiliate, joint venturer, partner, employee, employer, joint employer, or servant of the other for any purpose whatsoever.

B.     During the term of this Agreement, Franchisee shall hold itself out to the public as an independent contractor operating the business pursuant to a franchise from Franchisor. Franchisee agrees to take such action as shall be necessary to that end, including, without limitation, exhibiting a notice of that fact in a conspicuous place in the franchised premises, the content and form of which Franchisor reserves the right to specify in the Manuals or otherwise in writing.

C.     Franchisee and Controlling Principals understand and agree that nothing in this Agreement authorizes Franchisee or Controlling Principals to make any contract, agreement, warranty, or representation on Franchisor's behalf, or to incur any debt or other obligation in Franchisor's name; and that Franchisor shall in no event assume liability for, or be deemed liable hereunder as a result of, any such action; nor shall Franchisor be deemed liable by reason of any act or omission of Franchisee or Controlling Principals in the conduct of business at the Center or for any claim or judgment arising therefrom.

D.     (1)     Franchisee and each of Controlling Principals shall, at all times, indemnify and hold harmless to the fullest extent permitted by law Franchisor, its subsidiaries, affiliates, successors, and assigns and their respective directors, officers, shareholders, partners, servants, employees, agents, and representatives from all "losses and expenses" (as defined in Section 20.D.(4)(b)) incurred in connection with any action, suit, proceeding, claim, demand, investigation or inquiry (formal or informal), or any settlement thereof (whether or not a formal proceeding or action has been instituted) which arises out of or is based upon any of the following:

(a)    The infringement, alleged infringement, or any other violation or alleged violation by Franchisee or any of Controlling Principals of any patent, mark or copyright or other proprietary right owned or controlled by third parties (except as such may occur with respect to any rights in the Proprietary Marks or copyrights granted hereunder);

(b)    The violation, breach or asserted violation or breach by Franchisee or any of Controlling Principals of any contract, federal, state or local law, regulation, ruling, standard or directive or any industry standard;

(c)    Libel, slander or any other form of defamation of Franchisor or the System, by Franchisee or by any of Controlling Principals;

(d)    The violation or breach by Franchisee or by any of Controlling Principals of any warranty, representation, agreement or obligation in this Agreement or other agreement between Franchisee and Franchisor or its subsidiaries or affiliates; and

(e)    Acts, errors or omissions of Franchisee or any of Controlling Principals, or any of Franchisee's subsidiaries or affiliates or the officers, directors, shareholders, partners, agents, servants, employees, or representatives of Franchisee, its subsidiaries or affiliates in connection with the performance of the operation of the Center.

(2)    Franchisee and each of Controlling Principals agree to give Franchisor notice of any such action, suit, proceeding, claim, demand, inquiry or investigation. At the expense and risk of Franchisee and each of Controlling Principals, Franchisor may elect to assume (but under no circumstance is obligated to undertake), the defense and/or settlement of any such action, suit, proceeding, claim, demand, inquiry or investigation. Such an undertaking by Franchisor shall, in no manner or form, diminish the obligation of Franchisee and each of Controlling Principals to indemnify Franchisor and to hold it harmless.

(3)    In order to protect persons or property, or its reputation or goodwill, or the reputation or goodwill of others, Franchisor may, at any time and without notice, as it, in its judgment deems appropriate, consent or agree to settlements or take such other remedial or corrective action as it deems expedient with respect to the action, suit, proceeding, claim, demand, inquiry or investigation if, in Franchisor's sole judgment, there are reasonable grounds to believe that:

(a)    any of the acts or circumstances enumerated in Section 20.D.(1) above have occurred; or

(b)    any act, error, or omission of Franchisee or any of Controlling Principals or Controlling subsidiaries or affiliates may result directly or indirectly in damage, injury or harm to any person or any property.

However, the foregoing applies only if Franchisor is named a party to any action, suit, proceeding, claim, demand, inquiry or investigation to which Franchisee is a party to.

(4)    (a)    All losses and expenses incurred under this Section 20.D. shall be chargeable to and paid by Franchisee or any of Controlling Principals pursuant to its obligations of indemnity under this Section 20.D., regardless of any actions, activity or defense undertaken by Franchisor or the subsequent success or failure of such actions, activity or defense.

(b)     As used in this Section 20.D., the phrase "losses and expenses" shall include, without limitation, all losses, compensatory, exemplary or punitive damages, fines, charges, costs, expenses, lost profits, attorney's fees, court costs, settlement amounts, judgments, compensation for damages to Franchisor's reputation and goodwill, costs of or resulting from delays, financing, costs of advertising material and media time/space, and costs of changing, substituting or replacing the same, and any and all expenses of recall, refunds, compensation, public notices and other such amounts incurred in connection with the matters described.

(5)     Except for negligence or willful misconduct by the indemnified parties, the persons indemnified pursuant to Section 20.D. do not assume any liability whatsoever for acts, errors, or omissions of those with whom Franchisee, any of Controlling Principals or Franchisee's subsidiaries and affiliates may contract, regardless of the purpose. Franchisee and each of Controlling Principals shall hold harmless and indemnify the persons indemnified pursuant to this Section 20.D. for all losses and expenses which may arise out of any acts, errors or omissions involving claims covered by this Section 20.D.(1) of Franchisee Franchisee's Principals, any of Franchisee's subsidiaries or affiliates or the officers, directors, shareholders, partners, agents, servants, employees or representatives of Franchisee, its subsidiaries or affiliates and any such third parties without limit and without regard to the cause or causes thereof or the negligence of Franchisor or any other party or parties arising in connection therewith, and whether such negligence be sole, joint or concurrent, active or passive.

(6)     Under no circumstances shall the persons indemnified pursuant to this Section 20.D. be required or obligated to seek recovery from third parties or otherwise mitigate their losses in order to maintain a claim against Franchisee or any of Franchisee's Principals. Franchisee and each of Controlling Principals agree that the failure to pursue such recovery or mitigate loss will in no way reduce the amounts recoverable from Franchisee or any of Controlling Principals by the persons indemnified pursuant to this Section 20.D.

## 21.     Entire Agreement and Modification

This Agreement, the documents referred to herein and the Attachments hereto, set forth all of the promises, covenants, agreements and conditions between the Franchisor, Franchisee and the Controlling Principals and supersedes all prior and contemporaneous agreements and understandings, express or implied, oral or written. Except as otherwise provided herein, this Agreement may be amended, modified or canceled and any of the terms, covenants or conditions hereof may be waived only in writing and signed by both Franchisor and Franchisee.

## 22.     Approvals

A.     Whenever this Agreement requires the prior approval or consent of Franchisor, Franchisee shall make a timely written request to Franchisor therefor, and such approval or consent granted shall be in writing.

B.     Franchisor makes no warranties or guarantees upon which Franchisee may rely and assumes no liability or obligation to Franchisee or any third party to which it would not otherwise be subject, by providing any waiver, approval, advice, consent, or suggestion to Franchisee in connection with this Agreement, or by reason of any neglect, delay, or denial of any request therefor.

## 23.     Non-Waiver and Remedies

A.     No delay, waiver, omission, or forbearance on the part of Franchisor to exercise any right, option, duty, or power arising out of any breach or default by Franchisee or Controlling Principals under any of the terms hereof, shall constitute a waiver by Franchisor to enforce any such right, option, duty, or power with respect to any other breach or default by Franchisee or Controlling Principals or of any other rights hereunder. Acceptance by Franchisor of any payments due to it hereunder subsequent to the time at which such payments are due shall not be deemed to be a waiver by Franchisor of any preceding breach by Franchisee or Controlling Principals of any terms of this Agreement.

FAREV3.03                                              -34-

B.     All rights and remedies of the parties hereto shall be cumulative and not alternative, in addition to and not exclusive of any other rights or remedies which are provided for herein or which may be available at law or in equity in case of any actual or threatened breach, failure or default of any term, provision or condition of this Agreement or any other agreement between Franchisee and Franchisor or its subsidiaries and affiliates. The rights and remedies of the parties hereto shall be continuing and may be exercised at any time or from time to time. The expiration, earlier termination, or exercise of Franchisor's rights pursuant to Section 16. of this Agreement shall not discharge or release Franchisee or any of Controlling Principals from any liability or obligation then accrued, or any liability or obligation continuing beyond, or arising out of, the expiration, the earlier termination, or the exercise of such rights under this Agreement.

C.     Franchisee shall, during the term of this Agreement and thereafter, promptly pay all sums owing to Franchisor and its subsidiaries and affiliates. Such sums shall include all damages, costs and expenses, including reasonable attorneys' fees, incurred by Franchisor as a result of Franchisee's failure to perform its obligation hereunder (including damages, expenses and attorneys' fees incurred in obtaining injunctive or other relief in connection with the enforcement of any provision of this Agreement).

## 24.   Dispute Resolution

A.     Arbitration. Franchisor and Franchisee agree that, subject to Paragraph B. below, any claim, controversy or dispute between Franchisor (and its affiliates and their respective shareholders, officers, directors, agents, employees, successors and assigns) and Franchisee (and its Controlling Principals, Principals, guarantors, officers, directors, agents, employees, successors and assigns) arising out of or or relating to: (1) Franchisee's operation of the Center under this Agreement; (2) this Agreement or any other agreement between Franchisee and Franchisor; (3) the relationship created by this Agreement; (4) the validity of this Agreement or any other agreement between Franchisee and Franchisor; or (5) any System standard relating to the establishment or operation of the Center, will be submitted for binding arbitration before one arbitrator in accordance with the then-current commercial arbitration rules of the American Arbitration Association. If such rules are in any way contrary to or in conflict with this Agreement, the terms of this Agreement shall control.

Arbitration shall take place at a location specified by the arbitrator within ten miles of Franchisor's principal place of business in Dallas County, Texas. The award of the arbitrator shall be final and judgment upon the award rendered in arbitration may be entered in any court having jurisdiction thereof. The costs and expenses of arbitration, including compensation and expenses of the arbitrator, shall be borne by the parties as the arbitrator determines. Franchisor and Franchisee further agree that, in any arbitration proceeding, each must submit or file any claim which would consitute a compulsory counterclaim (as defined by Rule 13 of the Federal Rules of Civil Procedure) within the same proceeding as the claim to which it relates. Any claim, which is not submitted or filed as required is forever barred. The arbitrator may not consider any settlement discussions or offers that might have been made by either Franchisor or Franchisee.

Franchisor and Franchisee agree that arbitration will be conducted on an individual, not a class wide basis, and that an arbitration proceeding between Franchisor and Franchisee may not be consolidated with any other arbitration proceeding between Franchisor and any other person.

Franchisor and Franchisee waive any right to or claim for punitive or exemplary damages, except punitive or exemplary damages allowed under federal statute.

B.     Injunctive Relief. Notwithstanding any provision contained in Paragraph A. above, either party may institute in a court of competent jurisdiction an action or actions for temporary or preliminary injunctive relief; provided, however, that such party must contemporaneously submit the dispute for arbitration on the merits as provided in Paragraph A. above.

C.    Jurisdiction and Venue. With respect to actions described in Paragraph B. above and any other actions not subject to arbitration under Paragraph A. above, Franchisee and Controlling Principals hereby agree that Franchisor may institute any action against either or both of them in the state courts of Dallas County, Texas and the federal district court for the Northern District of Texas, Dallas Division, and Franchisee and Controlling Principals irrevocably submit themselves to the jurisdiction of such courts. Franchisee and Controlling Principals hereby waive all questions of personal jurisdiction for the purpose of carrying out this provision. Franchisee and Controlling Principals hereby irrevocably agree that service of process may be made upon them in any legal proceeding relating to or arising out of this Agreement or the relationship created by this Agreement by any means allowed by Texas or federal law.

D.    Governing Law. All matters relating to arbitration will be governed by the Federal Arbitration Act. This Agreement and the relationship of the parties shall be interpreted and construed under Texas law (except for Texas choice of law rules), and except to the extent governed by the United States Trademark Act of 1946 (Lanham Act, 15 U.S.C. §§ 1051 et. seq.), the Federal Arbitration Act, or other federal law.

E.    Waiver of Certain Damages and Jury Trial. Franchisor and Franchisee hereby waive any right to or claim for punitive or exemplary damages, except punitive or exemplary damages allowed under federal statute. Franchisor and Franchisee hereby irrevocably waive trial by jury on any action, proceeding or counterclaim, whether at law or in equity, brought by either of them.

25.    **Notices**

Any and all notices required or permitted under this Agreement shall be in writing and shall be personally delivered or mailed by expedited delivery service or certified or registered mail, return receipt requested, first-class postage prepaid, or sent by prepaid telex, or facsimile (provided that the sender confirms the telex or facsimile by sending an original confirmation copy thereof by certified or registered mail or expedited delivery service within three (3) business days after transmission thereof) to the respective parties at the following addresses unless and until a different address has been designated by written notice to the other party:

| | |
|---|---|
| If to Franchisor: | FASTSIGNS International, Inc.: |
| | 2550 Midway Road, Suite 150 |
| | Carrollton, Texas 75006 |
| | Attn: Law Department |
| | Facsimile No. (214) 346-5793 |

If to Franchisee or
Controlling Principals: To the mailing address of the Center unless
                        otherwise provided in writing to Franchisor.

Any notice given hereunder by certified or registered mail shall be deemed to have been given five (5) business days after the date of mailing, and any notice given hereunder by telex or facsimile shall be deemed to have been given upon receipt thereof, provided that the telex or facsimile is confirmed as provided in this Section. Business days for the purpose of this Section excludes Saturday, Sunday, and the following national holidays: New Year's Day, Martin Luther King Day, Presidents' Day, Memorial Day, Independence Day, Labor Day, Columbus Day, Veterans' Day, Thanksgiving, and Christmas.

26.    **Limitations of Claims**

Except for claims arising from Franchisee's non-payment or underpayment of amounts Franchisee owes Franchisor, any and all claims arising out of or relating to this Agreement or Franchisor's relationship with Franchisee will barred unless a judicial or arbitration proceeding is commenced within one (1) year from the date on which the party asserting the claim knew or should have known of the facts giving rise to the claims.

FAREV3.03                                    -36-

27.    **Severability and Construction**

A.    Except as expressly provided to the contrary herein, each portion, section, part, term, and provision of this Agreement shall be considered severable; and if, for any reason, any portion, section, part, term, or provision herein is determined to be invalid and contrary to, or in conflict with, any existing or future law or regulation by a court or agency having valid jurisdiction, such shall not impair the operation of, or have any other effect upon, such other portions, sections, parts, terms, or provisions of this Agreement as may remain otherwise enforceable, and the latter shall continue to be given full force and effect and bind the parties hereto; and said invalid portions, sections, parts, terms, or provisions shall be deemed not to be part of this Agreement.

B.    Except as expressly provided to the contrary herein, nothing in this Agreement is intended, nor shall be deemed, to confer upon any person or legal entity other than Franchisee, Franchisor, Franchisor's officers, directors, and employees, and such of Franchisee's and Franchisor's respective successors and assigns as may be contemplated (and, as to Franchisee, permitted) by Section 18. hereof, any rights or remedies under or by reason of this Agreement.

C.    All captions in this Agreement are intended solely for the convenience of the parties, and shall not affect the meaning or construction of any provision hereof.

D.    All references herein to the masculine, neuter, or singular shall be construed to include the masculine, feminine, neuter, or plural, where applicable; and, without limiting the obligations individually undertaken by Controlling Principals hereunder, all acknowledgments, promises, covenants, agreements, and obligations herein made or undertaken by Franchisee shall be deemed jointly and severally undertaken by all of Controlling Principals.

E.    The term "Franchisee's Principals" shall include, collectively and individually, Franchisee's spouse, if Franchisee is an individual, all officers and directors of Franchisee (including the officers and directors of any general partner of Franchisee) whom Franchisor designates as Franchisee's Principals and all holders of an ownership interest in Franchisee and of any entity directly or indirectly controlling Franchisee. The initial Franchisee's Principals shall be listed on Attachment "C". The term "Controlling Principals" shall include, collectively and individually, any Franchisee's Principal who has been designated by Franchisor as a Controlling Principal hereunder. For purposes of this Agreement, a publicly-held corporation is a corporation registered pursuant to Section 12. of the Securities Exchange Act of 1934, as amended, or a corporation subject to the requirements of Section 15.(d) of such Act.

F.    Each reference in this Agreement to a corporation or partnership shall be deemed to also refer to a limited liability company and any other entity or organization similar thereto. Each reference to the organizational documents, equity owners, directors, and officers of a corporation in this Agreement shall be deemed to refer to the functional equivalents of such organizational documents, equity owners, directors, and officers, as applicable, in the case of a limited liability company or any other entity or organization similar thereto.

G.    This Agreement may be executed in counterparts, and each copy so executed shall be deemed an original.

H.    This Agreement shall not become effective until signed by an authorized officer of Franchisor.

28.    **Force Majeure**

A.    As used in this Agreement, the term "Force Majeure" shall mean any act of God, strike, lock-out or other industrial disturbance, war (declared or undeclared), riot, epidemic, fire or other catastrophe, act of any government and any other similar cause not within the control of the party affected thereby.

FAREV3.03                                            -37-

B.      Except as provided in Section 16.B.(5), if the performance of any obligation by any party under this Agreement is prevented, hindered or delayed by reason of Force Majeure, which cannot be overcome by use of normal commercial measures, the parties shall be relieved of their respective obligations to the extent the parties are respectively necessarily prevented, hindered or delayed in such performance during the period of such Force Majeure; provided, however, that a party shall not be released of its obligation to pay amounts then owing hereunder. The party whose performance is affected by an event of Force Majeure shall give prompt notice of such Force Majeure event to the other party by telephone or telegram (in each case to be confirmed in writing), setting forth the nature thereof and an estimate as to its duration, and shall be liable for failure to give such timely notice only to the extent of damage actually caused.

## 29.      Compliance with Anti-Terrorism Laws

Franchisee and Franchisee's Controlling Principals agree to comply with and/or to assist Franchisor to the fullest extent possible in its efforts to comply with Anti-Terrorism Laws (as defined below). In connection with such compliance, Franchisee and Franchisee's Controlling Principals certify, represent, and warrant that none of Franchisee's or Franchisee's Controlling Principal's property or interests is subject to being "blocked" under any of the Anti–Terrorism Laws and that Franchisee and Franchisee's Controlling Principals are not otherwise in violation of any of the Anti-Terrorism Laws. "Anti-Terrorism Laws" means Executive Order 13224 issued by the President of the United States, the USA PATRIOT Act, and all other present and future federal, state and local laws, ordinances, regulations, policies, lists and any other requirements of any governmental authority addressing or in any way relating to terrorist acts and acts of war.  Any violation of the Anti-Terrorism Laws by Franchisee, Franchisee's Controlling Principals, or Franchisee's employees or any "blocking" of Franchisee's or Franchisee's Controlling Principal's assets under the Anti-Terrorism Laws shall constitute grounds for immediate termination of this Agreement and any other Agreement Franchisee or Franchisee's Controlling Principals have entered into with Franchisor or any of Franchisor's affiliates, in accordance with the termination provisions of this Agreement.

## 30.      Acknowledgments

Franchisee and Controlling Principals hereby represent, warrant, covenant and acknowledge to Franchisor that:

A.      Neither Franchisee nor any of Controlling Principals had any part in the creation or development of the System or the Proprietary Marks provided by Franchisor;

B.      Franchisor has made no representations or promises to or with Franchisee or a Franchisee's Principal which are not contained in this Agreement;

C.      Franchisee has conducted an independent investigation of the business venture contemplated by this Agreement and understands that the business venture involves substantial financial risks and largely depends upon the abilities of Franchisee;

D.      Franchisee has not relied upon, nor has Franchisor made, any representations, warranties or guarantees, expressed or implied, as to the potential volume, profits or success of the business venture contemplated herein;

E.      Franchisee has the full right and authority to enter into this Agreement without joinder of any other person;

F.      All information and materials provided to Franchisor by Franchisee and Controlling Principals, individually or collectively, are true and correct and complete to the best of their knowledge, information and belief;

FAREV3.03                                    -38-

G.     Franchisee has received a completed copy of this Agreement, the Addenda hereto and all agreements relating hereto, if any, at least five (5) business days prior to the date on which this Agreement was executed. Franchisee further acknowledges that it has received the disclosure document required by the Trade Regulation Rule of the Federal Trade Commission entitled "Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures" at least ten (10) business days prior to the date on which this Agreement was executed;

H.     Franchisee has received, read and understood this Agreement, the Addenda hereto, and all agreements relating hereto, if any, and Franchisor has accorded Franchisee ample time and opportunity to consult with advisors of Franchisee's own choosing about the potential benefits and risks of entering into this Agreement; and

I.     Franchisor's obligations and Franchisee's rights pursuant to this Agreement are expressly conditioned upon the continued truth of the representations and warranties set forth above at the time of execution hereof and throughout the term hereof.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the day and year first above written.

FASTSIGNS INTERNATIONAL, INC.

By: _____
Name: _____
Title: _____

ATTEST:                                              FRANCHISEE:

_____                    By: _____
                                                          Name: Joseph John Cifrodella
                                                          Title: _____
                                                          Date Signed: 9/16/13

ATTEST:                                              FRANCHISEE:

_____                    By: _____
                                                          Name: Lynn Renee Gabay
                                                          Title: _____
                                                          Date Signed: 9/16/13

## CONTROLLING PRINCIPALS

Each of the undersigned acknowledges and agrees as follows:

(1) Each has read the terms and conditions of the Franchise Agreement and acknowledges that the execution of this guaranty and the undertakings of the Controlling Principals in the Franchise Agreement are in partial consideration for, and a condition to the granting of this license, and that Franchisor would not have granted this license without the execution of this guaranty and such undertakings by each of the undersigned;

(2) Each is included in the term "Controlling Principals" as described in Section 27.E. of the Franchise Agreement;

(3) Each individually, jointly and severally, makes all of the covenants, representations, warranties and agreements of the Controlling Principals set forth in the Franchise Agreement and is obligated to perform thereunder; and

(4) Each individually, jointly and severally, unconditionally and irrevocably guarantees to Franchisor and its successors and assigns that all of Franchisee's obligations under the Franchise Agreement will be punctually paid and performed. Upon default by Franchisee or upon notice from Franchisor, each will immediately make each payment and perform each obligation required of Franchisee under the Franchise Agreement. Without affecting the obligations of any of the Controlling Principals under this guaranty, Franchisor may, without notice to the Controlling Principals, waive, renew, extend, modify, amend or release any indebtedness or obligation of Franchisee or settle, adjust or compromise any claims that Franchisor may have against Franchisee. Each of the Controlling Principals waives all demands and notices of every kind with respect to the enforcement of this guaranty, including, without limitation, notice of presentment, demand for payment or performance by Franchisee, any default by Franchisee or any guarantor and any release of any guarantor or other security for this guaranty or the obligations of Franchisee. Franchisor may pursue its rights against any of the Controlling Principals without first exhausting its remedies against Franchisee and without joining any other guarantor hereto and no delay on the part of Franchisor in the exercise of any right or remedy shall operate as a waiver of such right or remedy, and no single or partial exercise by Franchisor of any right or remedy shall preclude the further exercise of such right or remedy. Upon receipt by Franchisor of notice of the death of any of the Controlling Principals, the estate of the deceased will be bound by the foregoing guaranty, but only for defaults and obligations under the Franchise Agreement existing at the time of death, and in such event, the obligations of the remaining Controlling Principals shall continue in full force and effect.

ATTEST:                                   CONTROLLING PRINCIPALS

_____                   _____
Witness                                   Name: Joseph John Cifrodella

_____                   _____
Witness                                   Name: Lynn Renee Gabay

_____                   _____
Witness                                   Name:

_____                   _____
Witness                                   Name:

FAREV3.03                                 -40-